UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DENISE DELTONDO<br>*Plaintiff*<br><br>V.<br><br>THE SCHOOL DISTRICT OF PITTSBURGH;<br>THE BOARD OF PUBLIC EDUCATION OF THE<br>SCHOOL DISTRICT OF PITTSBURGH;<br>ANTHONY HAMLET<br>TIFFANY R. WASKOWICZ<br>DR. DAVID MAY-STEIN<br>DR. MONICA LAMAR<br>ANNE RECKHOUSE<br>SYLVIA WILSON<br>KEVIN CARTER<br>TERRY KENNEDY<br>CYNTHIA FALLS<br>WILLIAM J. GALLAGHER<br>PAMELA HARBIN<br>SALA UDIN<br>VERONICA EDWARDS<br>DEVON TALIAFERRO<br>*Defendants* | CIVIL ACTION NO.:   2:22-cv-350<br><br><br>CIVIL ACTION:<br><br>1.  1ST AMENDMENT -<br>    FREE SPEECH RETALIATION<br><br>2.  1ST AMENDMENT -<br>    POLITICAL ASSOC. RETALIATION<br><br>3.  14TH AMENDMENT<br>    PROCEDURAL DUE PROCESS<br><br>4.  DECLARATORY RELIEF<br><br><br><br>*JURY TRIAL DEMANDED* |

# CIVIL ACTION COMPLAINT

## INTRODUCTION

1.     Plaintiff Denise Deltondo was an employee for 27 years of defendant The School District of Pittsburgh, first as a math specialist and then as a vice principal for 3 years, before choosing to become a kindergarten teacher 3 years ago for family reasons. She dedicated her life to the district and has a spotless record.

2.     This ended when the leftwing District and other Defendants, without warning, viciously defamed and illegally terminated her for right of center out-of-school political

expression in violation of her First and Fourteenth Amendment rights.

3.     Specifically, Ms. Deltondo reposted on her personal Facebook a newspaper clipping which criticized and satirized the hypocrisy of those on government assistance living the high life while complaining about the alleged privilege of others who pay taxes.

4.     Concern about the inexorable growth of the welfare state has long been a staple of political debate, as has criticism of the growing number of Americans who subsist on taxpayer money while refusing to productively contribute to the economy.

5.     Indeed, in the last 30 years the labor force participation rate has plummeted, with nearly 100 million Americans opting out of the workforce. This is a shockingly unhealthy number and reflects a growing reliance on government handouts.

6.     Particularly disfavored are those recipients of government assistance who hypocritically ignore that they are extraordinarily privileged to rely on taxpayer assistance, yet act entitled to the money of others, while criticizing the alleged financial privilege of others who have worked hard and paid taxes all their lives.

7.     Some form of this viewpoint is held by a majority of Americans, is a matter of great public concern, and is squarely protected by the First Amendment.

8.     Defendants are well aware that its teachers have a First Amendment right to speak their mind outside of school, and that they may not target a teacher based on the viewpoint of out of school expression.

9.     Yet, when Defendants became aware of the post, they did not affirm her right to free speech as a private citizen.

10.     Instead, Defendants leapt to attack a longtime teacher with a spotless record because she was viewed as a political opponent who offended their sensitivities. Defendants

baselessly and outrageously defamed her and stigmatized her as a racist and bigot, and immediately placed her on suspension within intent to terminate without notice or a hearing.

11.     Defendants' actions unambiguously violated Plaintiff's First and Fourteenth Amendment rights, and the Collective Bargaining Agreement.

# Background

### Defendants Suspend Plaintiff Deltondo without Notice or Hearing because of the Political Content of Her Out of School Speech

12.     Plaintiff Denise Deltondo has been employed by the Pittsburgh School District for 27 years. During that time she has not a single blemish on her record and was an outstanding employee.

13.     Denise is right of center and supported Donald Trump for president. Her personal Facebook profile noted this. Her account did not identify herself as an employee of the Pittsburgh School District.

14.     On or around August 9, 2020, Denise Deltondo shared a Facebook post on her personal account by someone else which pictured a newspaper clipping. This was done on her personal time, on a private device. It was not during the school year. Her sole contribution was to comment "awesome read!" See Exhibit 1.

15.     The post pointed out the hypocrisy of those who rely on public assistance complaining about "privilege" while profligately spending that public assistance and living a life without the responsibility assumed by taxpayers. It is reproduced here:

> What is Privilege? ...
> Privilege is wearing $200 sneakers when you've never had a job.
> Privilege is wearing $300 Beats headphones while living on public assistance.
> Privilege is having a Smartphone with a Data plan which you receive no bill for.

> Privilege is living in public subsidized housing where you don't have a water bill, where rising property taxes and rents and energy costs have absolutely no effect on the amount of food you can put on your table.
> Privilege is the ability to go march against, and protest against anything that triggers you, without worrying about calling out of work and the consequences that accompany such behavior.
> Privilege is having as many children as you want, regardless of your employment status, and be able to send them off to daycare or school you don't pay for.
> Privilege is sending your kids to school early for the before-school programs and breakfast, and then keeping them there for the after-school program...paid for by the people who DO HAVE TO DEAL WITH RISING TAXES AND COSTS! ...you know, us so-called 'PRIVILEGED' the ones who pay while you TAKE TAKE TAKE!"

<u>See</u> Exhibit 1.

16.    Deltondo's post was motivated by opposition to the growing welfare state, and also by her own daughter's lack of self-awareness about the privileges she enjoys growing up.

17.    Again, all she personally did was share someone else's post and commented "awesome read!"

18.    Concern about the inexorable growth of the welfare state has long been a staple of political debate, as has criticism of the growing number of Americans who subsist on taxpayer money while refusing to productively contribute to the economy.

19.    Indeed, in the last 30 years the labor force participation rate has plummeted, with nearly 100 million Americans opting out of the workforce. This is a shockingly unhealthy number and reflects a growing reliance on government handouts. <u>See</u> Edith S. Baker, "Down and down we go: the falling U.S. labor force participation rate," MONTHLY LABOR REVIEW - BLS.gov (2018), https://www.bls.gov/opub/mlr/2018/beyond-bls/down-and-down-we-go-the-falling-us-labor-force-participation-rate.htm; Terry Jones, "Labor force participation rate mystery: Why have so many Americans stopped working?," INVESTOR'S BUSINESS DAILY (Feb. 14, 2020),

https://www.investors.com/news/labor-force-participation-rate-low/;           "Reconnecting

Americans to the Benefits of Work," Social Capital Project - Joint Economic

Committee - Republicans, U.S. Senate (October 2021),

https://www.jec.senate.gov/public/_cache/files/5ac0a254-ff00-4a18-baf0-

bdfedb9bb154/connections-to-work.pdf.

20.     Particularly disfavored are those recipients of government assistance who

hypocritically ignore that they are extraordinarily privileged to rely on taxpayer assistance, yet act

entitled to the money of others, while criticizing the alleged financial privilege of others who have

worked hard and paid taxes all their lives.

21.     Some form of this viewpoint is held by a majority of Americans, it is a matter of

great public concern, and it is squarely protected by the First Amendment. See "2016 poverty

survey," AEI - Los Angeles Times (Aug. 18, 2016), https://www.aei.org/research-

products/report/2016-poverty-survey/.

22.     Given that Plaintiff had engaged in out-of-school speech protected by the First

Amendment, upon learning about the post the school should have affirmed her right to free

expression and simply noted that her opinions were not that of the school.

23.     Defendants are, of course, well aware that its teachers have a First Amendment

right to speak their mind outside of school, and that they may not punish a teacher based on the

viewpoints expressed in out-of-school expression, especially for political reasons or at the behest

of her political opponents.

24.     Schools, as nurseries of democracy, also have a duty to *affirmatively* protect

unpopular expression, especially when it takes place off campus. See AF Ex Rel. Fultz v.

<u>Ambridge Area School District</u>, 2:21-cv-1051 (W.D. Pa. Aug. 27, 2021) (citing <u>Mahanoy School District v. Levy</u>, 594 U. S. _____ (2021)).

25.     The Supreme Court has stated "schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" <u>Mahanoy</u>, 594 U.S. ____.

26.     Defendants, needless to say, did the exact opposite of what the law requires. The left wing Defendants and administrators immediately retaliated against Denise as their political opponent.

27.     Defendant Superintendent Anthony Hamlet blasted Deltondo on August 10, 2020, on Facebook and Twitter, before anyone from the District even reached out to her:

> We have been made aware of a social media post shared by a Pittsburgh Public Schools staff member that does not reflect the attitude or beliefs of our District. As leaders actively working ***against racist ideas*** and policies to ensure all students can experience ***a bias-free education***, we take our responsibility as educators of our young people seriously and ***remain committed to eliminating all forms of bigotry and racism in our public schools***. As this personnel matter is currently under investigation, no further comment is available.

<u>See</u> Exhibit 2 - Defendants' Social Media Posts (emphases added). Hamlet's posts were immediately signal boosted by official Pittsburgh School District social media accounts.

28.     Following Defendants' posts, local television stations began to report on Ms. Deltondo's post and Defendants' actions.

29.     Denise was absolutely devastated and infuriated that after 27 years of service the Defendants would prejudge and attack her so blatantly based on the content of her political

opinions without even reaching out to her. The post in question does not mention race, and is broadly applicable across the racial spectrum.

30.     As can plainly be seen, Hamlet and the other Defendants had already decided as of August 10, 2020, that Deltondo is racist, bigoted, and cannot provide "a bias-free education."

31.     All of this is utterly false, especially the notion that a 27-year educator ***with no complaints*** could not provide a bias-free education. This is, in fact, blatantly defamatory and stigmatizing and it is not supported by any evidence. Again, there have been no complaints in 27 years that Plaintiff has failed to provide a bias-free education.

32.     It is also pure viewpoint discrimination on the part of Defendants to discipline and publicly attack Plaintiff because it disagrees with her private, out-of-school "beliefs." The First Amendment exists to prevent governmental officials from retaliating against those whose opinions they find offensive or disagree with.

33.     The labeling of speech as "racist" or "biased"—terms now arbitrarily invoked to justify disqualifying and attacking the political opponents of the Left—is itself proof positive of viewpoint discrimination by Defendants.

34.     Instead of robust intellectual debate, the Left—including the Defendants—have instead adopted the tactic *du jour*: claiming offense and assigning spurious and outrageous negative labels to the speech of one's political opponent to silence them.

35.     The mere act of pejoratively labeling political viewpoints Defendants do not like shows political animus and viewpoint discrimination. A governmental official cannot outlaw a dissenting opinion, nor dictate what opinions are orthodox and acceptable in politics. West Virginia State Board of Education v. Barnette, 319 U.S. 624 (1943); Startzell v. City of Philadelphia, Pennsylvania, 533 F. 3d 183, 200 (3d. Cir. 2008) (quoting Texas v. Johnson, 491

U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

36.    Indeed, the First Amendment exists specifically to protect controversial speech. Tinker v. Des Moines Independent Community School Dist., 393 US 503 (1969).

37.    These basic standards were affirmed yet again by the Supreme Court in Mahanoy School District v. Levy, 594 U. S. _____ (2021). Keep in mind that Denise engaged in out of school speech by an adult on matters of public concern that had no connection to her public school employment; the Supreme Court has always afforded this type of speech the very highest protection under the First Amendment. Id. (stating that if student at issue were an adult "the First Amendment would provide strong protection").

38.    Following the District publicly defaming and stigmatizing Denise based on the content of her opinions, she received a letter on August 11, 2020 suspending her indefinitely without notice or hearing because *of the content* of her Facebook repost:

> It was reported to Employee relations that you posted a message via social media that *does not reflect the attitude or beliefs of the District* and *contravenes the District's mission to actively work against racist ideas and policies* to ensure all students can experience a bias-free education.
>
> This correspondence serves as notification that the District is placing you on a paid administrative leave effectively immediately pending our investigation into this matter.

Exhibit 3 - August 11, 2020 Suspension Letter (emphases added). This letter echoes the public statements made by Defendants.

39.    As can be seen, the reasons given for her suspension were (1) that the content of her political expression contradict the "attitudes or beliefs of the District," (2) that her opinion

contradicts the "District's Mission to actively work against racist ideas and policies" in the school, and (3) that she cannot provide a bias-free education to students.

40.     This is a straightforward admission of illegal viewpoint discrimination and retaliation. The District is not allowed to establish what opinions are orthodox and acceptable, nor can it forbid Denise from contradicting their party line by insulting her, defaming her, and besmirching her good name.

41.     The District is not allowed to subjectively apply pejorative labels to the speech of political opponents for the purpose of retaliating against political opponents. If it was permitted to do so, the First Amendment would be nothing but a toothless paper tiger. Furthermore, the District is illegally invoking the Heckler's Veto to silence and punish Denise.

42.     The District is not permitted, without any evidence whatsoever from her schooling career, to assert that Denise cannot provide a bias-free education to students.

43.     All of Defendants' actions attacking Plaintiff were in manifest violation of the First Amendment to the United States Constitution and constituted viewpoint retaliation and discrimination.

44.     "If an employee can show that the agency knew that the reason for the threatened removal could not be substantiated, the threatened action by the agency is purely coercive" and illegal. Schultz v. United States Navy, 810 F. 2d 1133, 1136 (Fed. Cir. 1987). Here, Defendants always knew that their discipline and threats to remove Denise were baseless, but proceeded anyway out of ideological hatred. Their actions and threats were purely coercive.

45.     In addition to the First Amendment violation, Defendants' actions in suspending Denise without notice also blatantly violated Denise's procedural due process rights under the Fourteenth Amendment.

46.     Denise was a tenured teacher under the Public School Code and the Collective Bargaining Agreement. Denise therefore could only be disciplined for just cause, and had a property right in continuing employment. <u>See</u> Article 28, Pittsburgh Federation of Teachers Teacher/Professional Collective Bargaining Agreement (stating that "Teachers may be subject to disciplinary action only for just cause."); Public School Code of 1949, § 1122 (stating that educations professionals can only be terminated for just cause).

47.     The Third Circuit is unambiguous that in such circumstances it is clearly illegal to discipline an employee without notice or hearing, even if it is placing the employee on leave with pay. <u>See</u> <u>Dee v. Borough of Dunmore</u>, 549 F.3d 225 (3d Cir.2008); <u>Smith v. Borough of Dunmore</u>, 633 F. 3d 176, 180 (3d Cir. 2011). This goes even more so where there is an intent to terminate.

48.     Note that the public statements by Defendants on August 10, 2020, make it clear Denise's suspension was done with the intent to terminate. Defendants were well aware that after leveling such a toxic and poisonous broadside at Plaintiff that her return to the district was out of the question.

49.     In the <u>Dunmore</u> cases, a paid suspension of just eight days without notice or hearing was found to be a due process violation where the employee could only be disciplined for cause. <u>Id.</u>

50.     Here, Denise was *indefinitely* suspended without notice or hearing, and was also publicly blasted, humiliated, defamed, and stigmatized by Defendants. It is clear from Defendants' statements and actions that this was done with intent to terminate. This clearly violates her 14th Amendment due process rights.

51.     Moreover, the outrageous public attack on August 10, 2020, on Denise by Defendants made it impossible for Denise to return to her teaching position and permanently damaged her teacher career.

52.     Defendants had come to a predetermined conclusion, they publicly attacked her to make their decision final, and then were going to find a way to "justify" it later. This is the exact opposite of due process.

**Defendants Conduct a Predetermined and Sham Attempt to Make it Appear that Defendants Complied with Due Process**

53.     Following Denise's illegal suspension, Defendants then engaged in a fraudulent and predetermined process to make it look like Defendants had complied with the due process protections afforded to Plaintiff by the Fourteenth Amendment.

54.     On September 10, 2020, the Defendants scheduled what they misleadingly labeled a "Due Process Hearing" for September 17, 2020.

55.      Of course, such a hearing is supposed to take place *before* any deprivation; here, Denise was attacked publicly on August 10, and then suspended indefinitely without any notice or hearing back on August 11, 2020, with intent to terminate.

56.     Pre-deprivation hearings are governed by Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545-46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Loudermill requires that the District provide *notice* of the charges against the employee and explain the evidence to support those charges, and that the process not be predetermined. Id. (stating that before hearing employer must give "notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story").

57.     However, neither before nor during the September 17 meeting did Defendants ever identify what legal charges there were against Plaintiff, nor the evidence that could support the charges. This alone is a straightforward due process violation and means that the so-called "due process hearing" did not even remotely comply with the due process protections mandated by Loudermill.

58.     At the meeting the District representative, defendant Tiffany Waskowicz, did not even attempt to delineate charges or support such charges; instead she only repeatedly and viciously accused Plaintiff of being racist and asked Plaintiff to explain her ideological motivations for the post. This, too, is proof that Defendants were retaliating against Plaintiff based on the content of her opinions.

59.     Plaintiff told defendant Waskowicz that when she made the post she had actually had her daughter in mind—as well as the obvious commentary on the welfare state—and that the accusations of racism were preposterous based on her record and how she lived her life. Ms. Waskowicz was obviously angry that Ms. Deltondo refused to give in to her bullying, aggressive, and hectoring tone.

60.     This meeting, along with the public and private statements by Defendants, served to make it unambiguously clear that Denise's guilt and termination were predetermined.

61.     As noted, due to Defendants' public attacks on Denise, Defendants made it impossible for her to return the district and created a hostile work environment.

62.     Following the meeting, Denise heard nothing from the District *for three months*. Defendants' inordinate delay was highly prejudicial to Plaintiff's rights, especially considering that she was illegally suspended without notice or hearing on August 11, 2020. She had the right to continue in her occupation free and clear of any discipline. By delaying for 4.5 months, without

providing her any due process, as Defendants tried to figure out on what grounds they could terminate her, she was egregiously prejudiced and harmed.

63.     Not only was she deprived of employment for 4.5 months, and egregiously stigmatized, but the delay was purposeful on the part of Defendants—and prejudicial to Plaintiff—because it gave them time to figure out a way to pretextually justify her illegal termination. Kinniry v. Abington School District, 673 A.2d 429 (Pa. Cmwlth. 1996) (delay in due process that harms rights of Plaintiff is due process violation). She had a right to a speedy trial, which was simply denied.

64.     Keep in mind that the District suspended her without notice on August 11, 2020 for a Facebook post, claiming that they had to investigate. Yet, she was never notified or a part of any investigation; indeed, it is unclear what investigation was needed given the simplistic nature of the matter.

65.     One has to ask the question: what did Defendants do for 4.5 months while Plaintiff was illegally suspended without notice and publicly attacked by her employer, given that there was no investigation whatsoever?

66.     Defendants' claim they needed to do an investigation was not candid and was pretextual.

67.     On December 22, 2020—as the Christmas holiday was beginning—Defendants sent her a letter which purported to be a "Statement of Charges" justifying her termination. See Exhibit 4 - December 22, 2020 Statement of Charges Letter.

68.     The letter itself is an illegitimate screed personally attacking Plaintiff and her politics, and confirming beyond a shadow of a doubt that Plaintiff was terminated based on the content of her opinions and her political affiliation.

69.    The letter conclusorily asserts that Plaintiff is "racist" and then laundry lists almost every possible charge in the School Code, many of which do not even have the remotest applicability to such a situation: immorality, incompetency, intemperance, cruelty, persistent negligence in the performance of her duties, willful neglect of her duties, persistent and willful violation of or a failure to comply with school laws of this Commonwealth. Id.

70.    None of these charges had previously been raised with Denise at any point, and certainly not at the September 17, 2020 meeting.

71.    The laundry listing of these allegations, most of which have no hypothetical applicability to this situation, is proof of political animus and lack of fairness in the process being afforded to Plaintiff. This is a political persecution and the predetermined goal was to get rid of Plaintiff by any means possible.

72.    The letter also arbitrarily and falsely characterized Ms. Deltondo's demeanor at the September 17, 2020 sham hearing as "contrite." In fact, Ms. Wascowicz was furious in that meeting that Ms. Deltondo refused to admit she had done anything wrong.

73.    Defendants' willingness to arbitrarily characterize Plaintiff's demeanor in a Statement of Charges, to falsely make it seem as if she had admitted she did something wrong, demonstrates prejudgment of her alleged guilt and animosity.

74.    It must be noted that the way due process is supposed to work in Pennsylvania school cases is that *first* the employee is given Loudermill notice of the charges and evidence *before*, or at a minimum during, a Loudermill hearing.[1] Then, after the Loudermill hearing, and the employee has been given the opportunity to respond to the charges and evidence, the

---

[1] Of course, the Loudermill notice and hearing are supposed to happen before any deprivation occurs, but Defendants ignored that aspect of due process entirely.

employer then decides what charges it wants to pursue from the Loudermill notice—if any—and notifies the employee via a Statement of Charges.

75.     ***The Statement of Charges cannot include charges that the employee was not previously given notice of at the <u>Loudermill</u> phase***. This is the raison d'être of the <u>Loudermill</u> notice and hearing.

76.     Here, it is readily evident that the Statement of Charges is entirely illegitimate because no legitimate <u>Loudermill</u> notice or hearing took place and thus no notice was ever given; the Statement of Charges consists entirely of charges that ***were never previously raised with Plaintiff***. This is an egregious due process violation.

77.     Not only does the Statement of Charges fail to comply with due process notice requirements, it is factually deficient and the charges alleged are beyond the bounds of decency and blatantly defamatory. Defendants are corrupting due process and instead making the process itself the punishment.

78.     Each charge and its deficiency is described:

   a. **Immorality** - Defendants provide no support or evidence, instead conclusorily asserting that she is racist.
   b. **Incompetency** - Defendants provide no support or evidence, and this legal term has no applicability whatsoever to this situation.
   c. **Intemperance** - Defendants provide no support or evidence, and this legal term has no applicability whatsoever to this situation.
   d. **Cruelty** - Defendants provide no support or evidence, and this legal term has no applicability whatsoever to this situation. This is a particularly outrageous false accusation to make.
   e. **Persistent Negligence in the Performance of Duties** - Defendants provide no support or evidence, and this legal term has no applicability whatsoever to this situation. Given that the alleged misconduct consists of a single social media post outside of work, the lodging of this frivolous charge is further evidence of illegal political persecution.

f. **Willful Neglect of Duties -** Defendants provide no support or evidence, and this legal term has no applicability whatsoever to this situation. Given that the alleged misconduct consists of a single social media post outside of work, the lodging of this frivolous charge is further evidence of illegal political persecution.

g. **Persistent and Willful Violation of School Laws** - Defendants provide no support or evidence, and this legal term has no applicability whatsoever to this situation. Given that the alleged misconduct consists of a single social media post outside of work, the lodging of this frivolous charge is further evidence of illegal political persecution.

Exhibit 4. The paucity of any evidence to support the alleged charges is shocking. The content of this letter is blatantly defamatory—as were the prior District statements on social media—and the lodging of these factually unsupportable charges is a malicious prosecution without probable cause.

79.     The letter makes other allegations which are similarly devoid of any factual support. The letter claims, for instance, that Plaintiff is incapable of providing a bias-free education. Yet, not a single piece of evidence is presented from Plaintiff's 27-year career.

80.     The letter further claims that Plaintiff's post has impeded the ability of Plaintiff to teach and also impeded the operation of the Board; however, no such evidence is provided, only absurd and conclusory assertions. Contrary to this self-serving narrative, Defendants were already crystal clear back on August 10-11, 2020, that she was being disciplined because of ***the content of the post***.

81.     Any claim of disruption, especially when alleged for the first time four months later, is pure pretext to cover up the political motivations for Plaintiff's termination.

82.     Furthermore, there was no actual disruption to the District or Board, nor did the District or Board provide any such evidence.

83.     The fact that the Defendant board and its members would (1) allow her to be suspended so clearly in violation of her due process rights, (2) allow her to be publicly attacked, defamed, and stigmatized by District officials, (3) fail to provide her any Loudermill notice, and (4) draft such an outrageous and biased statement of charges, indicates that the Board was not capable of being an unbiased adjudicator.

84.     Of course, the Board was also incapable of being impartial as the decision to terminate Denise had been predetermined since August 10, 2020.

85.     Plaintiff's counsel objected to the deficient Statement of Charges on January 14, 2021, explaining that the Statement was utterly deficient. See Exhibit 5 - Letter Objecting to Statement of Charges.

86.     Defendants promised to respond, but simply never did so. They never responded because there is no way to justify their actions.

87.     Instead, after several months of ignoring the objections, they demanded that she appear for a Board Hearing despite the fact that holding any Board Hearing was improper and legally baseless, and despite the fact that no valid prerequisite Loudermill notice was given nor Loudermill hearing had taken place.

88.     Plaintiff's attorneys therefore sent another letter to the Board on March 16, 2021, explaining, in great detail, why Defendants' actions were illegal and that she would not participate in a sham hearing. See Exhibit 6.

89.     The letter also notified Defendants that effective immediately Plaintiff was no longer an employee, having been forced and coerced to leave:

> There is no possible way for her to return to the school district
> given the vicious and defamatory accusations you have made
> against her—including baselessly attacking her as racist,

incompetent, cruel, immoral, negligent, and intemperate—and the deliberate efforts you have taken to subvert her due process rights.

Her reputation has been sullied by the District on social media, television, and in the news media. She takes no pleasure in leaving, but it has been forced upon her because it is absolutely clear that the District has refused to correct the record, does not want her there, has refused to welcome her back, and overall has created such a poisonous and caustic environment that there is nothing that can be done to unring the bell and put her in the position she was in before this conduct occurred.

Exhibit 6. Defendants created an utterly intolerable situation, and their stubborn and politically motivated refusal to correct what had happened made the reunion of Plaintiff and Defendants an impossibility.

90.     Ms. Deltondo's was in fact constructively terminated.  A resignation is considered a constructive discharge if it was "involuntarily procured" "by coercion or duress," or by misrepresentations of material fact. See Judge v. Shikellamy School District, 905 F. 3d 122 (3d Cir. 2018); Schultz v. U.S. Navy, 810 F.2d 1133, 1136 (Fed. Cir. 1987).

91.     A constructive discharge also exists if the employee was subjected to a hostile work environment. See Indiana Univ. of Penn. v. Unempl. Comp. Bd. Of Review, 202 A.3d 195 (Pa. Cmwlth. 2019) (stating that treatment of claimant during investigation that called into question her character and integrity created hostile work environment); Porco v. Unempl. Comp. Bd. of Review, 828 A.2d 426, 428 (Pa. Cmwlth. 2003) ("In hostile work environment cases, Pennsylvania courts for half a century have found that . . . unjust accusations represent adequate justification to terminate one's employment. . . ."); Arufo v. Unempl. Comp. Bd. Of Review, 37 Pa. Commonwealth Ct. 555 (1978) (stating that an unjust "accusation [that is] ... a very real,

substantial, and serious personal affront to claimant's character and integrity" creates an "untenable" employment situation).

92.    An example of an involuntary resignation based on coercion is a resignation ***that is induced by a threat to take disciplinary action that the agency knows could not be substantiated***. <u>Staats v. US Postal Service</u>, 99 F.3d 1120 (Fed. Cir. 1996). A threatened termination without cause or basis is "purely coercive." <u>Judge</u>, *supra*.

93.    Here, the process was an illegitimate sham in all respects. She was illegally suspended without notice of the charges, and publicly berated, defamed, and humiliated by the District on its social media accounts at the time she was suspended. The reasons given for her August 11 suspension with pay were flatly illegal viewpoint retaliation, and no legal charges were even identified for 4.5 months. The public and private statements made concerning her made it unequivocally clear that Defendants had prejudged her guilty and that they were never going to let her return.

94.    After over 4 months of waiting without any <u>Loudermill</u> notice Defendants sent an illegitimate Statement of Charges to her, full of vituperative rhetoric and outrageous charges which had no hypothetical applicability to the situation. It then suspended her, without pay, for another 3 months, despite the fact that she still had never been afforded <u>Loudermill</u> notice or hearing.

95.    Any reasonable employee facing this hostile environment, concerted effort to prejudice her rights, corruption of the process, and rampant due process violations would be forced and coerced to resign. Plaintiff has no obligation to participate in a process that is clearly a sham, which is predetermined, which does not have a fair and impartial adjudicator, and for which not even the basic tenants of due process have been observed.

96.     Furthermore, as noted, Defendants created intolerable working conditions which constitute a constructive termination, which started when they publicly attacked and defamed her. <u>Barkauskie v. Indian River School Dist.</u>, 951 F. Supp. 519 (D. Del. 1996). Any teacher similarly attacked by their employer without

97.     Defendants' actions starting on August 10, 2020, labeling her a bigot, severely stigmatizing her, claiming that she was a biased educator and could not provide a bias free education, calling her a racist, and keeping her illegally suspended all made it impossible for her return to Pittsburgh School District. No reasonable employee so situated could have returned given the extreme and hostile environment the District had created.

98.     As a result of the outrageous conduct of the Defendants, Plaintiff has suffered the following harms:

    a.   Loss of past and future wages and benefits

    b.   Loss of career

    c.   Loss of position

    d.   Loss of reputation

    e.   Loss of free speech rights

    f.   Loss of due process, and

    g.   Severe mental and emotional damages

*****

## Parties

99.    Plaintiff, Denise Deltondo, ("Denise"), is an adult individual residing at 122 Midway Drive, McKees Rocks PA. She has worked for the District for 27 years, was a tenured teacher, and can only disciplined for just cause in accordance with due process.

100.    Defendant The School District of Pittsburgh, ("Pittsburgh School District" or "District") is public school district in Pittsburgh, Pennsylvania, which employed Denise Deltondo as a tenured teacher for the last three years, and for 27 years as an employee.

101.    Defendant The Board of Public Education of the School District of Pittsburgh, ("Board") is the governing body of the Pittsburgh School District.

102.    Defendant Dr. Anthony Hamlet is Superintendent of the Pittsburgh School District and is a resident of Pennsylvania. Defendant Hamlet directly participated, supervised, ratified, and acquiesced in Ms. Deltondo's discipline, termination, and demotion. Defendant is being sued in his official and individual capacities.

103.    Defendant Tiffany R. Waskowicz is the Director of Employee Relations for Pittsburgh School District, and is a resident of Pennsylvania. Defendant Waskowicz directly participated, supervised, ratified, and acquiesced in Ms. Deltondo's discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

104.    Defendant Dr. David May-Stein was Chief of School Performance for the Pittsburgh School District, and is a resident of the Pennsylvania. Defendant May-Stein directly participated, supervised, ratified, and acquiesced in Ms. Deltondo's discipline, termination, and demotion. Defendant is being sued in his official and individual capacities.

105.    Defendant Dr. Monica Lamar is an assistant superintendent for the Pittsburgh School District, and is a resident of the Pennsylvania. Defendant Lamar directly participated, supervised, ratified, and acquiesced in Ms. Deltondo's discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

106.    Defendant Annemarie Reckhouse is a Specialist for Workforce Management for the Pittsburgh School District, and is a resident of the Pennsylvania. Defendant Reckhouse directly participated, supervised, ratified, and acquiesced in Ms. Deltondo's discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

107.    Defendant Sylvia Wilson is the president of the Pittsburgh Board of Public Education, and is a resident of the Pennsylvania. Defendant Wilson directly participated, supervised, ratified, and acquiesced in Ms. Deltondo's discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

108.    Defendant Kevin Carter is the first vice president of the Board and is a resident of the Pennsylvania. Defendant Dr. Carter directly participated, supervised, ratified, and acquiesced in Ms. Deltondo's discipline, termination, and demotion. Defendant is being sued in his official and individual capacities.

109.    Defendant Terry Kennedy is the second vice president of the Board and is a resident of the Pennsylvania. Defendant Kennedy directly participated, supervised, ratified, and acquiesced in Ms. Deltondo's discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

110.    Defendant Cynthia Falls is a member of the Board and is a resident of the Pennsylvania. Defendant Falls directly participated, supervised, ratified, and acquiesced in Ms.

Deltondo's discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

111.    Defendant William J. Gallagher is a member of the Board and is a resident of the Pennsylvania. Defendant Gallagher directly participated, supervised, ratified, and acquiesced in Ms. Deltondo's discipline, termination, and demotion. Defendant is being sued in his official and individual capacities.

112.    Defendant Pamela Harbin is a member of the Board and is a resident of the Pennsylvania. Defendant Harbin directly participated, supervised, ratified, and acquiesced in Ms. Deltondo's discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

113.    Defendant Sala Udin is a member of the Board and is a resident of the Pennsylvania. Defendant Udin directly participated, supervised, ratified, and acquiesced in Ms. Deltondo's discipline, termination, and demotion. Defendant is being sued in his official and individual capacities.

114.    Defendant Veronica Edwards is a member of the Board and is a resident of the Pennsylvania. Defendant Edwards directly participated, supervised, ratified, and acquiesced in Ms. Deltondo's discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

115.    Defendant Devon Taliaferro is a member of the Board and is a resident of the Pennsylvania. Defendant Taliaferro directly participated, supervised, ratified, and acquiesced in Ms. Deltondo's discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

116.    When Plaintiff refers to "defendants" or the Pittsburgh School District or the Board she is referring to all defendants jointly, unless otherwise specified.

117.    All individual defendants, including the defendant board members, were aware of and approved the public statements by the District on August 10 and 11, and suspension of Ms. Deltondo without <u>Loudermill</u> notice or hearing on August 11, 2020. Furthermore, all Defendants supervised, participated in, and ratified the course of conduct against Deltondo from August 10, 2020 to present. Despite the entirety of the targeting of Plaintiff being utterly lawless the individuals defendants participated, supervised, approved, ratified, and acquiesced to the illegal attacks on Denise Deltondo.

118.    The individual defendants are Democrats, and fairly characterized as left wing politically.

119.    All individual defendants' conduct was of the sort that when considered separately, and in conjunction, was the type that imposes liability on the Pittsburgh School District and the Board.

120.    An individual defendant's "conduct implements official policy or practice or custom under several types of circumstances, imposing liability on the entities which employ them, including when (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred." <u>Hill v. Borough of Kutztown</u>, 455 F. 3d 225, 245 (3d Cir. 2006); (citing <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 478-484, 106 S.Ct. 1292, 89 L.Ed.2d 452

(1986); McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir.2005); LaVerdure v. County of Montgomery, 324 F.3d 123, 125-126 (3d Cir.2003)).

121.    Here, the actions by Defendants were not that of a rogue employee, but were entirely sanctioned by the District, Board, and chief executive at all points, from prior to August 11, 2020, to present. This included:

> a.  Publicly criticizing, condemning, stigmatizing, defaming, retaliating, and insulting Plaintiff on August 10 and afterwards, due to political animus against the viewpoint expressed in Plaintiff's Facebook post. This public assault on Plaintiff made it impossible for her to return to the District.
>
> b.  Indefinitely and illegally suspending Plaintiff on August 11, 2020, without Loudermill notice or hearing, and with intent to terminate.
>
> c.  Claiming that Defendants were doing an investigation of Ms. Deltondo, when no investigation took place.
>
> d.  Predetermining and prejudicing the termination of Plaintiff from August 10 onward.
>
> e.  Delaying from August 11 to September 17, 2020, before taking any action on Denise Deltondo's illegal suspension.
>
> f.  Holding a sham "due process hearing" on September 17, 2020, without providing any Loudermill notice of the legal basis for the charges or the supporting evidence.
>
> g.  Verbally attacking Ms. Deltondo in the September 17 meeting as racist and demanding that she admit to thought crimes.
>
> h.  Delaying for another three months until December 22, 2020, before taking any other action while Plaintiff remained illegally suspended.
>
> i.  Illegally suspending Denise Deltondo without pay as of December 22, 2020, with intent to terminate, without ever conducting a Loudermill hearing or notice over the prior 4.5 months.
>
> j.  Serving upon Plaintiff an utterly deficient Statement of Charges in advance of a sham Board Hearing. The Statement of Charges, as described throughout this complaint, is severely deficient both procedurally and substantively.
>
>> i.  The result of the hearing was predetermined and the Board was not an impartial and fair arbiter.

    ii.   The charges listed were never previously raised with Plaintiff in a required <u>Loudermill</u> notice and hearing.

    iii.   The charges listed were grossly inappropriate and laundry listed. They included many charges with no hypothetical applicability, such as cruelty or negligence.

    iv.   The basis for the charges were identified as that Ms. Deltondo's post was "racist." This is subjective labeling and characterization of the political expression in Plaintiff's post is by illegal viewpoint retaliation, not a legitimate basis to bring a litany of charges.

    v.   The letter further claims that Plaintiff's post has impeded the ability of Plaintiff to teach and also impeded the operation of the Board, but provides no such evidence. All reason for dismissal in the Statement of Charges were false and pretextual.

k.   Failing to respond to the January 14, 2021, letter from counsel objecting to the absurdly deficient attempts to terminate Plaintiff, despite promising to do so.

l.   Failing to respond to the February 5, 2021, email from counsel noting that the Defendants had never responded to the January 14 letter.

m.   Scheduling an illegal and improper sham Board Hearing for March 18, 2021.

n.   Deliberately creating a work environment so hostile that she could not return to work

122.    From August 10, 2020 onward, the District, Board and the individual defendants denied Plaintiff due process.

123.    Not only were all these actions and omissions done at the direction of the District and Board's final policy makers, but all actions and omissions that are the subject of this lawsuit were delegated by the District and Board to the District's employees.

124.    Restated, all actions by the Defendants in this lawsuit were "official" actions which impose liability on the entities, and were not the actions of individual employees acting without official imprimatur. Furthermore, even if a district employee did not have "official" authority at the time of an action or omission, the District and Board ratified that conduct by continuing and participating in the persecution of Plaintiff.

125.    The actions and omissions of the conduct were intentional, malicious, reckless, and/or negligent and demonstrated willful indifference and callous disregard for Plaintiff's rights.

*****

## Jurisdiction and Venue

126.    Jurisdiction (and venue) over the parties in the state and federal Courts of the Commonwealth of Pennsylvania is proper. Specifically, jurisdiction as to the Defendants is proper because they are all residents of the Commonwealth and conduct business here related to the claim at issue. Defendants transacted business in this Commonwealth and caused harm and compensable injury to Plaintiff and the assignors by acts or omissions committed in the Commonwealth of Pennsylvania that are the subject of the present complaint. All such business and harm occurred in the Western District of Pennsylvania.

127.    All federal claims are brought pursuant to and under 42 U.S.C. § 1983.

128.    The Western District of Pennsylvania has federal question subject matter jurisdiction over this matter.

*****

## COUNT I – First Amendment Retaliation for Expression

*Denise Deltondo*

*v.*

*All Defendants*

129.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

130.    "'[A] State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.' *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred. *See Gorum v. Sessoms,* 561 F.3d 179, 184 (3d Cir.2009)." Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 986 (3d Cir. 2014). The courts also hold that there are an additional two elements: (4) the employee also has to show that any ordinary employee in Plaintiff's circumstances would be deterred from engaging in similar speech by the Defendants' retaliatory conduct, and (5) that Defendants acted under color of law. Id.

131.    Dougherty applies the Supreme Court's Garcetti v. Ceballos, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) and Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) tests, which address when a public employee's speech is protected and the considerations taken into account when dismissing an employee for speech-related reasons.

132.     Here, the speech was on a private Facebook account, the content was unrelated to Plaintiff's employment, and the school has admitted to disciplining the employee because of the posts.

**First Element - Whether the Speech is Protected**

133.     The first element to be satisfied is whether the employee's speech is protected by the First Amendment.

134.     "As the Supreme Court has reiterated time and time again, 'free and unhindered debate on matters of public importance' is 'the core value of the Free Speech Clause of the First Amendment.' *Pickering,* 391 U.S. at 573, 88 S.Ct. 1731. Accordingly, 'public employees do not surrender all their First Amendment rights by reason of their employment.' *Garcetti,* 547 U.S. at 417, 126 S.Ct. 1951. At the same time, the Supreme Court also aptly recognizes the government's countervailing interest—as an employer—in maintaining control over their employees' words and actions for the proper performance of the workplace. *See id.* at 418-19, 126 S.Ct. 1951. Thus, '[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.' *Id.* at 419, 126 S.Ct. 1951." Dougherty, 772 F.3d at 993-94.

135.     Under Garcetti there is a three-step inquiry to determine if speech is protected by the First Amendment: (1) the employee must speak as a citizen not an employee, (2) the speech must involve a matter of public concern, and (3) the government must lack an 'adequate justification' for treating the employee different than the general public based on its needs as an employer under Pickering. See Dougherty, 772 F.3d at 987. Under Pickering the courts "'balance... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public

services it performs through its employees.' 391 U.S. at 568, 88 S.Ct. 1731. The more tightly the First Amendment embraces the employee's speech, the more vigorous a showing of disruption must be made by the employer. *McGreevy,* 413 F.3d at 365." Dougherty, 772 F.3d at 991.

136.    There is no question under Garcetti and Pickering that Plaintiff's speech is protected.

137.    **First**, the Facebook post in question by Plaintiff was as a private citizen and was unconnected to her employment. They were not made in the course of her official duties and had nothing to do with her job.

138.    **Second**, the speech in question was in fact on matters of public concern—hotly contested social and political issues—unrelated to her job and which she directed to the public as a private citizen. Plaintiff's political speech on non-school issues in a non-school setting is afforded the broadest protection, as if she was a private citizen.

139.    **Third**, the governmental Defendants have the heaviest burden—a burden they cannot meet—showing that Plaintiff's speech could cause disruption and that they should treat her differently than a member of the general public. The Pickering test arose to address where the speech in question has some relation to the employee's job which could cause disruption in the workplace.

140.    Here, the speech in question has no connection to Plaintiff's employment at all, and thus no actual work-related disruption is conceivable that could be the basis of action for Defendants. The employer is not permitted to characterize political speech unrelated to school as controversial for the purpose of claiming it could be disruptive. Rankin v. McPherson, 483 U.S. 378, 387 (1987) (stating "[t]he inappropriate or controversial character of a statement is irrelevant to the question of whether it deals with a matter of public concern").

141.    Defendants, when suspending Plaintiff with intent to terminate in August 2020, did not cite to disruption as a reason for their disciplinary action. In fact, Defendants instead explicitly admitted to viewpoint discrimination, claiming that her post conflicted with the "attitude or beliefs of our District," and also attacked Plaintiff as a racist unable to provide a "bias-free education." This is straightforward content based discrimination which is illegal.

142.    Defendants, incredibly, confirmed on August 11, 2020, that she was being disciplined based on Defendants' opposition to the viewpoints of her out of school political opinions. Again, disruption was not cited.

143.    At the September 17 hearing, Defendants also did not cite "disruption" as a reason for suspending her nor did they provide any evidence of the same; they instead labeled her a racist.

144.    It was only on December 22, 2020, in the Statement of Charges, that Defendants conclusorily asserted ***for the first time*** that disruption had occurred; no evidence was provided of any disruption, despite Defendants being required to provide this evidence to Plaintiff under <u>Loudermill</u> and the 14th Amendment.

145.    In fact, this assertion of disruption was without basis; the real reason for the discipline was what Defendants publicly stated in August 2020: that they did not like Plaintiff's "attitude or beliefs."

146.    This type of *post hoc* rationalization is not only viewed as pretext by the courts, but also as evidence of viewpoint discrimination. <u>American Freedom Defense v. Washington Metro.</u>, 901 F. 3d 356, 366 (D.C. Cir. 2018). Pretextual and insincere excuses to justify viewpoint discrimination are to be disregarded. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 146–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

147.     Controversial political speech is exactly the type of speech meant to be protected by the First Amendment. <u>McIntyre v. Ohio Elections Comm'n</u>, 514 U. S. 334, 347 (1995) ("[A]dvocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression"). Indeed, the Supreme Court has consistently and repeatedly held that "the First Amendment protects 'even hurtful speech on public issues to ensure that we do no stifle public debate.'" <u>Mahanoy</u>, 594 U. S. _____ (2021) (quoting <u>Synder v. Phelps</u>, 562 (U.S. 443, 461 (2011)).

148.     The <u>Mahanoy</u> court held that schools have:

> an interest in protecting a student's unpopular expression, especially when the expression takes place off campus. America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the "marketplace of ideas." This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will. That protection must include the protection of unpopular ideas, for popular ideas have less need for protection.

<u>Id.</u>

149.     Where a public employer claims the right to punish speech because of "disruption," the Supreme Court holds that "When it comes to political or religious speech that occurs outside school or a school program or activity, the school ***will have a heavy burden to justify intervention***." <u>Id.</u> (emphasis added).

150.     Note that the <u>Mahanoy</u> court was analyzing out of school speech *by a student*— where schools have a hypothetical interest in regulating student speech because of the school's parental role—but still noted that schools have a heavy burden to justify intervention.

151.    Consider that a school's attempt to justify intervention over an ***adult*** employee's out of school political speech, where the school does not serve in a parental role, is a practically impossible burden for Defendants to satisfy, without an extreme demonstration of disruption.

152.    Allowing Defendants to claim that it can terminate employees for controversial speech would give carte blanche to the Heckler's Veto and render the First Amendment a dead letter.

153.    Thus, Plaintiff's speech is squarely protected by the First Amendment.

**Second and Third Elements - Defendants Retaliated against Plaintiff Because of Her Protected Speech**

154.    The second element is that Plaintiff must show that her protected speech was a "substantial or motivating" factor in retaliatory actions taken against her by Defendants, and that there was not some other legitimate reason for her termination. In other words, she needs to show causation. Mirabella v. Villard, 853 F. 3d 641, 651-52 (3d Cir. 2017).

155.    In a retaliation claim, the courts ask "whether the Government is punishing the plaintiffs for exercising their rights." Id. (quoting Miller v. Mitchell, 598 F.3d 139, 148 n.9 (3d Cir. 2010))**.**

156.    Where the retaliation includes "official speech" by the Defendants the Courts ask whether there was "a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow." Id.

157.    Here, there is no question that the governmental employer punished Plaintiff for exercising free speech rights on political and social issues they disagreed with, and that Defendants' official speech included overt threats, coercion, stigmatization, defamation, and intimidation.

158.     Plaintiff was expressly told by Defendants that the adverse actions by Defendants against her were because of the content of her political Facebook post, which is protected speech. Specifically, Defendants subjectively labeled the content of her speech as "racist," a tactic utilized by Democratic politicians such as Defendants to demonize their political opponents.

159.     This is established not only by Defendants' express public statements on August 10 that Plaintiff was racist and bigoted, but also by the express statements of Defendants on August 11, September 17, and December 22, 2020.

160.     Defendants were not considering any disciplinary action against Plaintiff, until they learned about her Facebook post.

161.     Overall, Plaintiff was disciplined and terminated for privately expressing political views Defendants did not like and found offensive. The evidence is overwhelming that the posts were an impermissible but substantial motivating factor in Plaintiff's termination.

162.     There are many specific examples of retaliatory actions which are independently and jointly actionable:

     a.  Publicly criticizing, condemning, stigmatizing, defaming, retaliating, and insulting Plaintiff on August 10 and afterwards, due to political animus against the viewpoint expressed in Plaintiff's Facebook post. This public assault on Plaintiff made it impossible for her to return to the District.

     b.  Indefinitely and illegally suspending Plaintiff on August 11, 2020, without Loudermill notice or hearing, and with intent to terminate.

     c.  Claiming that Defendants were doing an investigation of Ms. Deltondo, when no investigation took place.

     d.  Predetermining and prejudicing the termination of Plaintiff from August 10 onward.

     e.  Delaying from August 11 to September 17, 2020, before taking any action on Denise Deltondo's illegal suspension.

f.  Holding a sham "due process hearing" on September 17, 2020, without providing any <u>Loudermill</u> notice of the legal basis for the charges or the supporting evidence.

g.  Verbally attacking Ms. Deltondo in the September 17 meeting as racist and demanding that she admit to thought crimes.

h.  Delaying for another three months until December 22, 2020, before taking any other action while Plaintiff remained illegally suspended.

i.  Illegally suspending Denise Deltondo without pay as of December 22, 2020, with intent to terminate, without ever conducting a <u>Loudermill</u> hearing or notice over the prior 4.5 months.

j.  Serving upon Plaintiff an utterly deficient Statement of Charges in advance of a sham Board Hearing. The Statement of Charges, as described throughout this complaint, is severely deficient both procedurally and substantively.

   i.  The result of the hearing was predetermined and the Board was not an impartial and fair arbiter.

   ii.  The charges listed were never raised with Plaintiff in a required <u>Loudermill</u> notice and hearing.

   iii.  The charges listed were grossly inappropriate and laundry listed. They included many charges with no hypothetical applicability, such as cruelty or negligence.

   iv.  The basis for the charges were identified as that Ms. Deltondo's post was "racist." This is subjective labeling and characterization of the political expression in Plaintiff's post is by illegal viewpoint retaliation, not a legitimate basis to bring a litany of charges.

   v.  The letter further claims that Plaintiff's post has impeded the ability of Plaintiff to teach and also impeded the operation of the Board, but provides no such evidence. All reason for dismissal in the Statement of Charges were false and pretextual.

k.  Failing to respond to the January 14, 2021, letter from counsel objecting to the absurdly deficient attempts to terminate Plaintiff, despite promising to do so.

l.  Failing to respond to the February 5, 2021, email from counsel noting that the Defendants had never responded to the January 14 letter.

m.  Scheduling an illegal and improper sham Board Hearing for March 18, 2021

n.  Deliberately creating a work environment so hostile that she could not return to work

163.    All the retaliatory actions were intended as punishment, and were taken by Defendants because they desired to punish Plaintiff for expressing viewpoints they disagreed with.

164.    Note that even a baseless suspension with pay for a retaliatory reason is itself legally actionable on its own and by itself.  See Smith v. Borough of Dunmore, 633 F. 3d 176, 180 (3d Cir. 2011).

165.    Smith illustrates the egregious nature of Defendants' actions. Smith held that a suspension without notice or a hearing is an extreme measure only appropriate in cases where public safety is directly implicated—a reason which is not even remotely applicable in this case. Id.

166.    Here, Plaintiff was suspended without notice or hearing on August 11, after having been viciously attacked on August 10 by the District Superintendent and the District's official social media accounts. It is clear from the public and private statements made by the District that this was done with the intent to terminate Plaintiff.

167.    As noted, the third element of a First Amendment retaliation claim states that when Plaintiff has shown viewpoint retaliation played a part in her termination, then the burden is on the Defendants to show that there was some other legitimate reason for their actions. See Connick v. Myers, 461 U.S. 138, at 152-53 (1983) (explaining that the greater the extent to which the speech involves matters of public concern, the stronger the employer's showing must be). If Defendants can establish a prima facie legitimate reason for disciplining Plaintiff and that an illegal reason was not a substantial motivating factor, then the burden shifts back to Plaintiff to show pretext.

168.    The evidence, and Defendants' own admissions, overwhelmingly prove that Defendants' actions were solely retaliation for the content of Plaintiff's private Facebook post, and that they cannot meet any such burden.

169.    Defendants have attempted to claim in the Statement of Charges, *ex post facto*, that Plaintiff was suspended because Denise's ability to teach was impeded or that she had impaired the Board's operation (i.e., disruption).

170.    Yet, this was not the reason given in August 2020, and was only tacked on to the Statement of Charges on December 22, 2020. No evidence has been submitted to support either such allegation, an egregious due process violation in and of itself. Therefore, Defendants cannot meet their burden to show they had a legitimate reason to discipline and terminate Plaintiff. They also cannot meet this burden because Plaintiff's ability to teach was never impeded, and the Board's operation was never impaired.

171.    Defendants also cannot meet their burden because it is glaringly evident that, at a minimum, political malice and viewpoint discrimination was a significant reason and/or a substantial motivating factor for the discipline ***regardless of whether*** Defendants could hypothetically show they also had a legitimate reason. Mirabella, 853 F. 3d at 651-52. Where the illegitimate reason is still a substantial motivating factor, Defendants lose the case without any burden shifting.

172.    Furthermore, any claim of disruption or impediment to job duties is pretextual as shown by the fact that there is no evidence to support the allegations and they were not the given reasons at the time of the discipline. These new pretextual reasons were added on by lawyers after the fact to  cover up that a substantial motivating reason for the discipline against Plaintiff was that that Defendants found the content of her post offensive.

**Fourth and Fifth Element - That an Ordinary Employee would Be Deterred from Engaging in Protected Speech and that Defendants Acted Under Color of Law**

173.    The fourth element is that an ordinary employee would be deterred by the retaliatory actions of the employer, and the fifth is that the Defendants acted under color of law.

174.    Here, there is no question, given the public condemnation of Plaintiff by Defendants, and her illegal and indefinite suspension, that an ordinary employee in Plaintiff's position will be deterred from privately posting political expression on Facebook which could hypothetically offend the left wing Defendants. Indeed, the arbitrariness with which the subjective term "racist" is used to disqualify and silence political opponents of the Left would deter any reasonable employee from engaging in speech to avoid public vivisection and loss of employment.

175.    Defendants at all points acted under color of law and held themselves out as having the authority and right to take the retaliatory actions against Plaintiff, and maintain to this day that using the Facebook post to terminate Deltondo was proper.

**Denise Deltondo was Constructively Terminated**

176.    A "resignation" is involuntary if coerced or the employer subjected the employee to a hostile work environment so unbearable the employee resigns. Ulrey v. Reichhart, 941 F. 3d 255, 261 (7th Cir. 2019) (citing Pennsylvania State Police v. Suders, 542 U.S. 129, 146-47, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)); Goss v. Exxon Office Systems Co., 747 F. 2d 885 (3d Cir. 1984).

177.    On August 10, 2020, Ms. Deltondo was told without any prior notice that she was suspended indefinitely. She was given no hearing nor notice. It was abundantly clear from the

August 10 and 11 public and private statements by Defendants that it was with intent to terminate.

178.    The public and private statements by Defendants falsely and outrageously accusing her of racism, being a bigot, and incapable of providing a bias-free education made it impossible for Deltondo, and any reasonable employee, to return to the District.

179.    Especially in the political climate in this day and age, and considering the overwhelming political affiliation of those in education and in the Pittsburgh School District in particular, such accusations are poison and spell the end of careers.

180.    Instead of respecting political differences, maintaining neutrality, and affording due process to longtime employees, Republicans and conservatives can be disciplined and terminated at will simply because their Democratic governmental employer disagrees with their opinions.

181.    That Plaintiff could not return to her job was confirmed by the vicious attacks on Ms. Deltondo by Defendants on September 17 and December 22, 2020, calling her racist and a bigot and claiming without evidence that she could not provide a "bias-free" education.

182.    Furthermore, Denise was forced and coerced to resign. There was no basis to suspend her without notice or hearing, nor to purport to force her to undergo a sham and predetermined board hearing based on such a deficient and politically motivated Statement of Charges.

183.    A resignation is considered a constructive discharge if it was "involuntarily procured" "by coercion or duress," or by misrepresentations of material fact. See Judge v. Shikellamy School District, 905 F. 3d 122 (3d Cir. 2018); Schultz v. U.S. Navy, 810 F.2d 1133,

1136 (Fed. Cir. 1987). Also relevant is whether a reasonable person "would have felt compelled to resign." Id.

184.    "An example of an involuntary resignation based on coercion is a resignation that is induced by a threat to take disciplinary action that the agency knows could not be substantiated." Staats v. US Postal Service, 99 F.3d 1120 (Fed. Cir. 1996).

185.    The Third Circuit holds that where there is no cause for the threatened termination "the choice between resignation and the initiation of termination proceedings was 'purely coercive.'" Judge, 905 F.3d at 123 (quoting Schultz, *supra*).

186.    Defendants' actions against Plaintiff go far beyond even the "purely coercive" conduct referenced in Judge and Schultz. Not only could the reason for discharge not be substantiated, but no disciplinary charge warranting dismissal (or any other punishment) was ever identified in a Loudermill notice. This was a malicious prosecution in every sense.

187.    Plaintiff objected to the clearly improper, unfair, and outrageous process taking place, and her objections were ignored. It was a predetermined sham with no legal basis.

188.    As noted throughout this Complaint, the retaliation against Plaintiff was a malicious prosecution without any cause and was blatantly illegal "regardless of the fairness of the procedures used." See Daniels v. Williams, 474 US 327, 331 (1986).

189.    A reasonable person facing this concerted and illegal effort to coerce a resignation/demotion would feel compelled to involuntarily consent.

190.    A constructive discharge also exists if the employee was subjected to a hostile work environment. Goss v. Exxon Office Systems Co., 747 F. 2d 885 (3d Cir. 1984); see also Indiana Univ. of Penn. v. Unempl. Comp. Bd. Of Review, 202 A.3d 195 (Pa. Cmwlth. 2019) (stating that treatment of claimant during investigation that called into question her character and

integrity created hostile work environment); <u>Porco v. Unempl. Comp. Bd. of Review</u>, 828 A.2d 426, 428 (Pa. Cmwlth. 2003) ("In hostile work environment cases, Pennsylvania courts for half a century have found that . . . unjust accusations represent adequate justification to terminate one's employment. . . ."); <u>Arufo v. Unempl. Comp. Bd. Of Review</u>, 37 Pa. Commonwealth Ct. 555 (1978) (stating that an unjust "accusation [that is] ... a very real, substantial, and serious personal affront to claimant's character and integrity" creates an "untenable" employment situation).

191.    Defendants in fact created intolerable working conditions which constitute a constructive termination. <u>Barkauskie v. Indian River School Dist.</u>, 951 F. Supp. 519 (D. Del. 1996).

192.    Defendants' actions, labeling her a bigot, severely stigmatizing her publicly and to the community, claiming that she was a biased educator and could not provide a bias free education, calling her a racist, and keeping her illegally suspended all made it impossible for her return to Pittsburgh School District.

193.    Defendants also egregiously violated her Fourteenth Amendment rights and made it impossible for Plaintiff to ever trust Defendants again.

194.    No reasonable employee so situated could have returned given the extreme and hostile environment the District had created.

**The Individual Defendants are Not Entitled to Qualified Immunity**

195.    When governmental officials are sued in their individual capacities under § 1983, they can only claim qualified immunity if the Constitutional rights at issue were not clearly established.

196.    Here, the right at issue is Plaintiff's right to freedom of speech in non-school settings on issues not related to the school district.

197.     Courts generally look to the Supreme Court and Courts of Appeal as to whether a right is clearly established; however, other authority may be cited as well.

198.     Here, the right of public employees to speak freely about political issues in non-school settings on matters of public concern is near absolute.

199.     Indeed, the right to free speech in the First Amendment which protects Plaintiff's Facebook posts is basic Civics 101.

200.     The case law is likewise clear that public employees have a right to speak out on issues of public concern, outside of work, as explained by the Third Circuit in Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 993-94 (3d Cir. 2014):

   a.     "Since at least 1967, "it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick, 461 U.S. at 142, 103 S.Ct. 1684 ; see also Rankin, 483 U.S. at 383, 107 S.Ct. 2891 (finding the same principle "clearly established"). In the case at bar, Dougherty's particular type of speech—made as a concerned citizen, purporting to expose the malfeasance of a government official with whom he has no close working relationship—is exactly the type of speech deserving protection under the Pickering and Garcetti rules of decision and our subsequent case law. See, e.g., Pickering, 391 U.S. at 566, 88 S.Ct. 1731 (protecting speech by teacher to local newspaper criticizing the school board and the superintendent's allocation of school funds); O'Donnell, 875 F.2d at 1060, 1061–63 (protecting speech by chief of police to local television station that accused township supervisors of various corrupt practices, legal improprieties, and abuses of their positions); Watters,

55 F.3d at 897–98 (protecting speech by program manager to local newspaper criticizing departmental program the employee oversaw where dispute existed over cause of disruption); Baldassare, 250 F.3d at 199–200 (protecting investigation into alleged wrongdoing of law enforcement officers where there was no "alter ego" relationship). Thus, Appellants had fair notice that their retaliation against Dougherty's constitutionally protected speech would not be shielded by qualified immunity."

201.    This case is far more clear-cut than even those cases cited by Dougherty. The cases cited by Dougherty all involved speech that at least related in some way to the governmental employer's operations.

202.    Here, the speech in dispute was private political expression on Plaintiff's private Facebook account completely unrelated to her employment, and were in fact almost entirely reposts of memes on political issues and the 2020 election.

203.    All individual Defendants knew and should have known that Plaintiff's speech was protected as evidenced by longstanding Third Circuit and Supreme Court precedent on First Amendment Retaliation and Fourteenth Amendment Due Process protections. They therefore have no qualified immunity.

204.    As a result of the First Amendment retaliation against Plaintiff, she has suffered grievous harm, including to her career, economically, mentally, emotionally, and reputationally.

205.    Plaintiff also demands punitive damages against all Defendants for their outrageous and blatantly unconstitutional conduct which showed, at a minimum, a reckless indifference to her rights.

## COUNT II – First Amendment Retaliation for Political Affiliation

*Denise Deltondo*

*v.*

*All Defendants*

206.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

207.    To make out a claim of discrimination based on political association, a public employee must allege (1) that the employee works for a public employer in a position that does not require a political affiliation, (2) that the employee maintained a political affiliation, and (3) that the employee′s political affiliation was a substantial or motivating factor in the adverse employment decision. Goodman v. Pennsylvania Turnpike Com′n, 293 F.3d 655, 663-664 (3d Cir. 2002). Plaintiff must also show that an ordinary employee in her circumstances would be deterred from holding and expressing her political affiliations, and that Defendants acted under color of law.

208.    Here, Plaintiff's position as a tenured teacher does not require a political affiliation.

209.    Plaintiff's private Facebook contained and expressed statements of political affiliation and support for the 2020 Presidential Campaign of President Donald J. Trump.

210.    As described throughout this complaint, Defendants took adverse action against Plaintiff both because she affiliated with President Trump, and also because of the perceived political affiliations her Facebook post conveyed.

211.    In general, it has to be taken into account that Defendants' personnel and culture are overwhelmingly liberal and Democratic.

212.    The tenor of the public debate, including inside Defendant school district, is now that any person perceived as having unacceptable opinions can and should be canceled for being offensive, as Defendants stated publicly and privately to Ms. Deltondo.

213.    As a direct and proximate result of Plaintiff's perceived political associations and perceived opposition to Defendants' favored political support groups, she was suspended with intent to terminate and constructively terminated.

214.    Plaintiff's political affiliations were a substantial motivating factor in Defendants disciplining her. There were no legitimate reasons for her discipline, as described *supra*, and any such reason were also pretextual.

215.    Note that as with the free speech retaliation claim, the rights at issue are longstanding and indisputable. The right to engage in Political Activities and associate and identify as one likes in nonschool settings is expressly recognized. As a result, no defendant being sued on an individual basis can invoke qualified immunity.

216.    As a result of the First Amendment retaliation against Plaintiff, she has suffered grievous harm, including to her career, economically, mentally, emotionally, and reputationally.

217.    Plaintiff also demands punitive damages against all Defendants for their outrageous and blatantly unconstitutional conduct which showed, at a minimum, a reckless indifference to her rights.

*****

# COUNT III – Procedural Due Process

*Denise Deltondo*

*v.*

*All Defendants*

218.     Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

219.     A plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) the procedures available to him did not provide "due process of law." <u>Alvin v. Suzuki</u>, 227 F.3d 107, 116 (3d Cir.2000). An essential principle of due process is that a "deprivation of life, liberty, or property `be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" <u>Loudermill</u>, 470 U.S. at 542, 105 S.Ct. at 1493 (quoting <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 313, 70 S.Ct. 652, 656-57, 94 L.Ed. 865 (1950)). Due process fundamentally requires that the individual be given an opportunity for a hearing before she is deprived of her property interest. <u>Id.</u>

220.     Plaintiff Denise Deltondo alleges due process violations of three distinct types:

   a.   A property based due process claim, because she was suspended without notice depriving her of her right to continue in her employment.

   b.   A stigma plus liberty due process claim

   c.   A reputation plus liberty due process claim

221.     Note that certain government actions are barred regardless of the fairness of the procedures used to implement them, which serves to prevent governmental power from being "used for purposes of oppression," Murray's Lessee [474 U.S. 327, 332]   v. Hoboken Land & Improvement Co., 18 How. 272, 277 (1856) (discussing Due Process Clause of Fifth

Amendment).

222.    Plaintiff wants to be absolutely clear that Defendants had no basis upon which to take any adverse action against her, and that even if she had been given the fairest of process it could not legitimatize what Defendants have done.

223.    However, the conduct of Defendants during this so-called process was so deficient that it must be subject to court review and sanction as a matter of public record.

**a.    Due Process Claim for Property Interest in Continued Employment**

224.    Ms. Deltondo had a clear and indisputable property interest in her continuing employment.

225.    "To have a property interest in a job . . . a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment." Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir.2005) (citing Bd. of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Whether a person has a legitimate entitlement to — and hence a property interest in — his government job is a question answered by state law. Id.

226.    Under Pennsylvania law, Ms. Deltondo was a 27-year employee of Defendants, as well as a tenured teacher. The Pennsylvania School Code provides that teachers can only be dismissed for just cause, see § 1122, **and** section 28(1) of the Collective Bargaining Agreement further states that tenured teachers such as Denise ***cannot be disciplined without just cause***.

227.    She therefore has a property interest in continuing employment and not being disciplined without just cause in accordance with the Due Process protections in the U.S Constitution as expressed by the U.S. Supreme Court.

228.    The following actions were taken by the district without notice or an opportunity

to be heard, in violation of the School Code and due process protections under the Fourteenth Amendment.

a.  Indefinite suspension with pay without notice or hearing on August 11, 2020, and without pay as of December 22, 2020, all with intent to terminate

i.  Denise Deltondo was suspended without notice or pay despite no prior history of discipline. Only a strong government interest can justify the pre-hearing deprivation of a property right, usually related to public safety concerns, which are not implicated by this case. Dee v. Borough of Dunmore, 549 F.3d 225 (3d Cir. 2008); Smith v. Borough of Dunmore, 633 F. 3d 176, 180 (3d Cir. 2011) (stating that where employee can only be dismissed for cause, the plaintiff has a property interest in not being suspended without cause).

ii.  The public and private statements made by Defendants, defaming and stigmatizing her, make it clear that Defendants had already decide to terminate Deltondo as of August 11, 2020. She was suspended without pay on December 22, 2020.

b.  The Failure at Any Point to Provide Deltondo a Loudermill Notice or a Hearing as Required by Law

i.  As noted, Plaintiff was suspended without notice on August 11, 2020. However, at no point after was she ever given a Loudermill notice or hearing identifying the legal charges against her and evidence.

ii.  Defendants held what they called a "due process" hearing on September 17. However, at no point before or during did Defendants ever actually provide notice to Ms. Deltondo of the charges and evidence against her. Defendants made no attempt to have this meeting comport with Loudermill.

iii.  This entire process has been a predetermined sham which violated both the letter and spirit of the law.

c.  The Extreme Delay in the Illegal Process by Defendants, and the False Claim an Investigation was Needed

i.  Defendants falsely told Deltondo that an investigation was taking place, even though the only thing at issue was her out-of-school Facebook post. Inexplicably, Defendants delayed over 1 month before having a meeting with Plaintiff on September 17 which consisted of them trying to get her to admit to thought crimes.

ii.  Defendants then delayed for another 3.5 months, until immediately before the Christmas holiday on December 22, 2020. There was no

cause or reason for this delay, and the delay prejudiced Plaintiff's rights.

d.   The Statement of Charges was an Illegitimate Political Attack

   i.   The Statement of Charges listed charges that had never previously been listed in any Loudermill hearing (because no Loudermill notice or hearing had ever taken place).

   ii.   The Statement of Charges furthermore laundry listed nearly every possible charge in the School Code, most of which do not even have any hypothetical applicability to the dispute, and which are slanderous and outrageous.

   iii.   The Statement over and over rotely repeats Defendants' characterization and labeling of Denise as racist as justification for their attempt to fire her, demonstrating that the discipline was illegally motivated by viewpoint retaliation.

   iv.   The Statement claims that Denise cannot provide a bias-free education and that the Board cannot operate, but provides no evidence.

e.   The Board hearing was Illegitimate, Predetermined, and Not Impartial

   i.   The vituperative and attacking nature of the Statement of Charges, as well as the Board's ratification of the statements made about her and her 4.5 month illegal suspension, serve to make it clear that the Board Hearing was predetermined, was a sham, and that the Board is not an impartial arbiter.

229.   Everything about Defendants' actions evidence an improper retaliatory intent and lack of due process.

**b.   Plaintiff has a Stigma-Plus Due Process Claim against Defendants**

230.   A "stigma plus" claim occurs when the government imposes "a stigma or other disability that foreclose[s] [the plaintiff's] freedom to take advantage of other employment opportunities." O'Donnell, 148 F.3d at 1140 (quoting Roth, 408 U.S. at 573). The theory is, in essence, that some government action might impose such a harsh taint that it interferes with an individual's "right to follow a chosen trade or profession." Cafeteria Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 895-96 (1961).

231.    This implicates Plaintiff's liberty interest, as opposed to her property interests.

232.    The government must impose so great a constraint on an individual's future employment opportunities that it "involve[s] a tangible change in status" — that is, it must amount to "an adjudication of status under law." Kartseva v. Department of State, 37 F.3d 1524, 1527 (D.C. Cir. 1994); O'Donnell, 148 F.3d at 1141 ("[A] plaintiff who . . . seeks to make out a claim of interference with the right to follow a chosen trade or profession that is based exclusively on reputational harm must show that the harm occurred in conjunction with, or flowed from, some tangible change in status."). The action must have a "broad effect of largely precluding [her] from pursuing her chosen career." Kartseva, 37 F.3d at 1528; GE Co. v. Jackson, 610 F.3d 110, 121 (D.C. Cir. 2010).

233.    The stigma does not have to result from official speech, but can also result from the overall nature of the conduct by Defendants.

234.    Here, Plaintiff was suspended without notice with intent terminate based on Defendants finding the viewpoints in her Facebook post offensive. At around the time of her illegal suspension, the District made public comments about Ms. Deltondo, falsely accusing her of being racist, bigoted, and incapable of providing a bias free education.

235.    Furthermore, the suspension letter the outrageous Statement of Charges reiterate those same accusations, baselessly accused her of violating nearly every provision of the school code, and suspended her without pay.

236.    If Denise attempts to apply for a job anywhere, she will have to disclose what the District did to her.

237.    As a result of the concerted and deliberate effort by Defendants to stigmatize and discipline Denise, Defendants have severely harmed and stigmatized Denise and made it largely

impossible to pursue her chosen career.

238.    She has suffered severe damage as a result, including loss of employment, loss of wages, future employment, mental and emotional anguish, and loss of reputation.

239.    She also requests that her name and reputation be cleared by the district.

240.    Plaintiff's demand letter of January 14, 2021, specifically requested that her name and reputation be cleared when it stated that Denise Deltondo requested a name clearing hearing.

**c.   Plaintiff has a Reputation-Plus Due Process Claim Against Defendants**

241.    As opposed to a stigma plus claim, a reputation plus claim requires that Plaintiff show that she was defamed and be accompanied by a discharge or demotion. This claim is only actionable when the employer has disseminated the reasons for the termination and the dissemination is defamatory.

242.    Here, Plaintiff was illegally suspended, constructively terminated, and had her career destroyed, all of which independently and jointly constitutes the "plus."

243.    The last remaining element requires that the dissemination be defamatory.

244.    Here, Defendants made demonstrably false accusations of racism, bigotry, and also falsely stated that Denise was incapable of providing a bias-free education on August 10 and August 11, 2020.

245.    Setting aside that it is prohibited for Defendants to establish a political orthodoxy or fire employees for offending their political sensitivities, it is a false statement of fact to claim that Denise Deltondo is archetypally racist, that she is bigoted, that she is incapable of providing a bias-free education, or that she violated any aspect of the School Code much less was cruel or negligent. For 27 years, no one made any accusation against her, nor is there any evidence supporting this.

246.    These false statements of fact were published to third parties by the Defendants' social media accounts in August 2020, by the District on August 11, and on December 22, 2020.

247.    She has suffered severe damage as a result, including loss of employment, loss of wages, future employment, mental and emotional anguish, and loss of reputation.

248.    She also requests that her name and reputation be cleared by the district.

249.    As noted, she expressly requested that her name be cleared on January 14, 2021.

**d.    Defendants Should Have Known that their Allegations Against Plaintiff were False**

250.    What is more, Defendants knew or should have known its defamatory attacks against her were false.

251.    She had a 27-year record without any blemishes. Defendants' absurd and defamatory attacks are based solely on their political reaction to the Facebook post.

252.    As Defendants well know, Denise has a long track record of participation in the community and helping her students of all races without any bias or hint of racism.

253.    The suspension, constructive, termination, and related defamatory statements by the District will also necessarily have to be disclosed if Denise looks for a job elsewhere.

254.    Because of Defendants' actions, Plaintiff's life has been destroyed, she lost her job, her career, and her reputation.

255.    In today's day and age, accusations of the sort that Defendants have made against Plaintiff are a stake through the heart of a public educator's career. Defendants knew this, and acted deliberately to punish and retaliate against Plaintiff because of her politics.

256.    As a result she has suffered severe economic, mental, emotional, and reputational damages.

257.    The individual Defendants cannot claim qualified privilege because the rights at

issue are clearly established.

258.    Plaintiff also demands punitive damages against all Defendants for their outrageous and blatantly unconstitutional conduct which showed a reckless indifference to her rights.

*****

# COUNT IV –   DECLARATORY AND EQUITABLE RELIEF - NAME-CLEARING HEARING

*Denise Deltondo*

*v.*

*All Defendants*

259.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

260.    Plaintiff hereby demands a name-clearing hearing.

261.    Plaintiff's January 2021 letter specifically requested that her name be cleared when it stated that Ms. Deltondo was demanding: a "complete clearing of her personnel file of any mention of this incident," a "positive recommendation letter placed in her file, in the event she seeks new employment," as well as reinstatement. See Exhibit 5.

262.    Plaintiff's counsel further told Defendants' counsel that she wanted her named cleared and any trace of this removed from her file.

*****

# <u>RELIEF REQUESTED</u>

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, on all counts and claims compensatory damages in an amount in excess of this court's jurisdictional limitations, thereby guaranteeing Plaintiff a jury trial, exclusive of interests and costs, and an award of punitive damages, as well as prejudgment interest, post judgment interest, delay damages, costs, and such other equitable relief as the Court deems necessary; and requests that this Court determine and declare that Plaintiff be awarded for all counts:

    a.    A name-clearing hearing and public retraction and correction.

    b.    Compensatory damages, inclusive of any and all harm attributable to Defendants' actions or inaction, including loss of earnings, loss of career, reputational/stigma damage,

    c.    Mental and emotional pain and suffering;

    d.    Punitive damages to punish the Defendants for their outrageous conduct, self-interest, and duplicitous behavior, reckless and callous indifference to Plaintiff's rights, and evil motives;

    e.    Exemplary damages to set an example for others;

    f.    Attorneys' fees, costs, and court costs under § 1988;

    g.    interest;

    h.    prejudgment interest;

    i.    Delay damages;

    j.    Other equitable relief that may be necessary to enforce Plaintiff's rights; and,

    k.    Such other and further relief and/or equitable relief that this Court deems just and/or necessary.

*****

*Respectfully submitted,*
Francis Alexander, LLC
*/s/ AJ Fluehr*

Alfred J. Fluehr, Esquire
Attorney ID No.: 316503
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 341-1063
F: (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*/d/   February 25, 2022*

# Jury Trial Demand

Plaintiff hereby demands a 12-person jury trial.

# Certificate of Service

I hereby certify that a true and correct copy of the foregoing Complaint was filed with and served via the Electronic Filing System on the following:

The School District of Pittsburgh;
The Board of Public Education of the School District of Pittsburgh;
Anthony Hamlet
Tiffany R. Waskowicz
Dr. David May-Stein
Dr. Monica Lamar
Anne Reckhouse
Sylvia Wilson
Kevin Carter
Terry Kennedy
Cynthia Falls
William J. Gallagher
Pamela Harbin
Sala Udin
Veronica Edwards
Devon Taliaferro

*****
*Respectfully submitted,*
Francis Alexander, LLC

*/s/ AJ Fluehr*

Alfred J. Fluehr, Esquire
Attorney ID No.: 316503
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 341-1063
F: (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
/d/   February 25, 2022

# COMPLAINT EXHIBIT LIST

Exhibit 1 – August 2020 Deltondo Facebook Post

Exhibit 2 – Defendants' Social Media Posts

Exhibit 3 – August 11, 2020 Suspension Letter

Exhibit 4 – December 22, 2020 Statement of Charges

Exhibit 5 – Jan. 14, 2021, Letter Objecting to Statement of Charges

Exhibit 6 – March 16, 2021 Letter Objecting to Sham Board Hearing