**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DENISE DELTONDO,                              )
                                             )
                    Plaintiff,               )
                                             )
vs                                           )      Civil Action No. 2:22-350
                                             )
                                             )      Magistrate Judge Dodge
THE SCHOOL DISTRICT OF PITTSBURGH,           )
et al.,                                      )
                                             )
                    Defendants.              )

## REPORT AND RECOMMENDATION

### I.    Recommendation

It is respectfully recommended that Defendants' Motion for Summary Judgment (ECF No. 225) be denied.

### II.   Report

#### A.    Relevant Procedural History

Plaintiff Denise Deltondo ("Deltondo"), a former Kindergarten teacher with the School District of Pittsburgh (the "District"), filed this civil rights action pursuant to 42 U.S.C. § 1983 in February 2022, asserting several claims arising out of actions taken against her by her employer after she reposted a controversial Facebook post. In addition to the District, she originally named as defendants the District's Board of Public Education (the "School Board") and its nine members; Anthony Hamlet, the former Superintendent ("Hamlet"); Assistant Superintendent Monica Lamar; David May-Stein, the Chief of School Performance; Director of Employee Relations Tiffany Waskowicz ("Waskowicz"); and Anne Reckhouse, Specialist for Workforce Management.

After Defendants filed a motion to dismiss and a motion to strike, Deltondo filed an Amended Complaint (ECF No. 13) which asserted claims of retaliation in violation of the First

Amendment (Count I), political affiliation retaliation (Count II), procedural due process and stigma-plus violations under the Fourteenth Amendment (Count III) and a request for a name-clearing hearing (Count IV). Federal question jurisdiction is based on Deltondo's civil rights claims, 28 U.S.C. §§ 1331, 1343.

Defendants' subsequent motion to dismiss the Amended Complaint (ECF No. 26) was granted in part and denied in part. On March 16, 2023, Judge Stickman entered an order (ECF No. 43), adopting a Report and Recommendation (ECF No. 35) and dismissing Counts II, III, and IV as well as all claims against the School Board members and Defendants May-Stein, Lamar, and Reckhouse.[1]

As a result, Deltondo's only remaining claim is that the District, the School Board, Hamlet, and Waskowicz retaliated against her in violation of her rights under the First Amendment to the United States Constitution.

The parties then engaged in discovery. After the close of discovery, the remaining Defendants moved for summary judgment (ECF No. 225), which has been fully briefed (ECF Nos. 226, 236, 239).[2]

**B.  Material Facts[3]**

---

[1] Judge Stickman also affirmed a Memorandum Order (ECF No. 36) that granted in part and denied in part Defendants' Motion to Strike various paragraphs from the Amended Complaint.

[2] Defendants have also filed a motion seeking attorney's fees and costs as a sanction (ECF No. 248) that will be addressed in a separate order.

[3] These facts are taken from Defendants' Concise Statement, Plaintiff's Response and her Counter Concise Statement and Defendants' Reply, but only to the extent they are relevant. Plaintiff responded to Defendants' 154 paragraphs of facts with an additional 73 paragraphs of facts to which Defendants replied at length. Many of the facts submitted by the parties relate to issues that are not material or relevant to the resolution of Defendants' motion.

1.  Background about the parties

The District is the largest school district in Allegheny County and the second largest school district in Pennsylvania. (Defendants' Statement of Undisputed Material Facts in Support of Summary Judgment) ("DSUMF") ¶ 1) (ECF No. 227.) It includes 20,000 students from the Pittsburgh area from Pre-K through Grade 12. Its student body is composed of 64.7% low-income families and 67% racially diverse students. The District participated in the [USDA's] Community Eligibility Provision ("CEP") which permits all to eat for free regardless of their financial standing. All students at Banksville Elementary, where Deltondo taught, qualify to receive free breakfasts and lunches through the CEP program. (*Id.* ¶¶ 2-4.)

The Board supervises the District Superintendent. During the relevant time period for the events of this case, Sylvia Wilson served as the Board President, Anthony Hamlet was the District Superintendent and Tiffany Waskowicz was the Director of Employee Relations. (*Id.* ¶¶ 5, 7-10.)

Deltondo is a teaching professional licensed by the Commonwealth of Pennsylvania. (*Id.* ¶ 11.) She worked for the District for 27 years as both as a teacher and administrator. She had no disciplinary incidents on her record. (Plaintiff's Concise Statement of Material Facts for Summary Judgment ("PCSMF") ¶ 1) (ECF No. 234.) Deltondo received distinguished and above average marks on her evaluations, including the equity components of the evaluations, and before this incident, had never advised she was racist or mean to children. (PCSMF ¶ 2.)[4] She resigned from employment with the District on March 16, 2021 by means of a letter to the District from her

---

[4] Defendants cite a comment in response to the Privilege Post from a former student that "I knew she was a bigot when she taught me in the 6th grade! She HATED ME! & I felt EVERY INCH OF NEGATIVE ENERGY SHE THREW AT ME." (Defendants' Response to Plaintiff's Concise Statement of Material Facts ("DRPCSMF") ¶ 2) (ECF No. 240.) However, a comment made in 2020 does not create a disputed fact about what Deltondo was told before this incident.

counsel. (DSUMF ¶ 13.)[5]

During 2020-2021, Deltondo was a Kindergarten teacher at Banksville Elementary School in the District. (DSUMF ¶ 12.) According to the District's job description, a Kindergarten teacher in the District "is responsible for effectively educating and supporting students by ensuring they are learning academically, developing strong character, and gaining skills that prepare them for college and career." Kindergarten teachers have, among other duties, the duty to provide a safe, equitable, and inclusive school environment for all students. Knowledge, skills, and abilities required for Kindergarten teachers also entails, among other competencies, the following: ability to manage the classroom, supervise students and provide a safe, nurturing environment that stimulates academic, moral, and social growth. (*Id.* ¶¶ 14-15.)[6] Teachers also supervise students while they have breakfast, which is supposed to be eaten in the students' classroom. (*Id.* ¶ 16.)

As a teacher, Deltondo was subject to the Pennsylvania Code of Professional Practice and Conduct for Educators (the "Code of Conduct") and policies established by the District. Section 1122 of the Code of Conduct identifies and defines several grounds for discipline, including: immorality; incompetency; intemperance; cruelty; persistent negligence in the performance of duties; and persistent and willful violation of or failure to comply with school laws of the Commonwealth, including official directives and established policy of the Board. (*Id.* ¶¶ 17-18.)

Under the District's Freedom of Speech Policy, the District "reserves the right to limit

---

[5] Deltondo disputes this statement because she contends that she was constructively discharged. (Plaintiff's Response in Opposition to Defendants' Concise Statement of Facts for Summary Judgment ("PRDSUMF") ¶ 13) (ECF No. 235.) However, her constructive discharge claim was dismissed.

[6] Deltondo claims that she cannot verify these statements because the hyperlink provided by Defendants is "broken." (PRDSUMF ¶¶ 14-15.) The Court was able to access the documents through the hyperlink provided.

employee speech or take disciplinary action against an employee when the District's interest in promoting the effective and efficient delivery of public education outweighs the employee's interest in commenting on a matter of public concern." Even when an employee is not engaged in the performance of District duties, Board policy states that employees must: (1) recognize that as a District employee, their comments generally will be viewed as a representative of the District, and (2) state clearly that their comments represent personal views and not those of the District. (*Id.* ¶¶ 19-20.)

According to Deltondo, the policy was never mentioned by Defendants in 2020 or 2021 as a basis for discipline. (PRDSUMF ¶¶ 19-20.)[7]

### 2. The Privilege Post

On August 9, 2020, Deltondo shared on her personal Facebook and Instagram accounts a post originated by another person. The original post (the "Privilege Post") stated as follows:

> What is Privilege? ...
> Privilege is wearing $200 sneakers when you've never had a job.
> Privilege is wearing $300 Beats headphones while living on public assistance.
> Privilege is having a Smartphone with a Data plan which you receive no bill for.
> Privilege is living in public subsidized housing where you don't have a water bill, where rising property taxes and rents and energy costs have absolutely no effect on the amount of food you can put on your table.
> Privilege is the ability to go march against, and protest against anything that triggers you, without worrying about calling out of work and the consequences that accompany such behavior.
> Privilege is having as many children as you want, regardless of your employment status, and be able to send them off to daycare or school you don't pay for.
> Privilege is sending your kids to school early for the before-school programs and breakfast, and then keeping them there for the afterschool program ... paid for by the people who DO HAVE TO DEAL WITH RISING TAXES AND COSTS! ...you know, us so-called 'PRIVILEGED' the ones who pay while you TAKE

---

[7] In their reply, Defendants argue that Deltondo is improperly challenging the Free Speech Policy for the first time. (ECF No. 239 at 5 n.5.) However, it does not appear that she is challenging the policy; rather, her position is that she was never informed that she had violated it.

TAKE TAKE!"

(*Id.* ¶ 23.) When she reposted the Privilege Post on her Facebook account, Deltondo included the statement "awesome read!" accompanied by a "celebration hands emoji." On her Instagram account, she included the statement, "Someone actually wrote it down and spelled it out for everyone." (*Id.* ¶¶ 25-26.)

Deltondo's social media accounts, which did not identify her as a teacher or the identity of her employer, were restricted such that only friends could see her posts. The posts at issue were made during the summer and not pursuant to any of her job duties. (PCSMF ¶¶ 11-12.)[8] She testified that she re-posted the Privilege Post because she liked the social and political commentary it contained, especially as it related to the welfare state in general. She further testified that she also privately connected it to her daughter. She does not believe that the Privilege Post targets any one race or people, but instead offers a critique of irresponsible spending on well-known luxury items (which she has bought for her own children) by those on public assistance. (*Id.* ¶¶ 13-14; DSUMF ¶ 29.)

Deltondo knew that she had Facebook friends who were Banksville Elementary employees and believes one of these employees likely saw her post, took a screenshot of it, and shared it with others. She also knew that some District students received reduced cost or free lunches. (DSUMF ¶¶ 27-28.) Deltondo notes, however, that the Privilege Post does not criticize providing free lunches but satirizes people who use the program but then demonize the individuals who fund such

---

[8] Various summer programs in the District were ongoing and the District central office was operating during the summer. In addition, principals, and assistant superintendents are 12-month employees and the District was preparing for the fall return of students. (DSUMF ¶¶ 30-31.) That said, Deltondo was a teacher, not a principal or assistant superintendent, and was not working during the summer. While Defendants assert that social media users identified her as a teacher at Banksville Elementary (*id.* ¶ 24), the comments to which Defendants cite were made in response to the District Statement discussed below (PRDSUMF ¶ 24).

programs as "privileged." (PRDSUMF ¶ 27.)

### 3. Responses to the Privilege Post

According to Defendants, District administrators and staff received complaints about Deltondo's Privilege Post and brought them to the attention of Assistant Superintendent Dr. Monica Lamar ("Dr. Lamar") and Alexis Fadick, who had been the Principal of Banksville Elementary since 2019 ("Principal Fadick"). (DSUMF ¶¶ 32-33.) In an August 11, 2020 Employee Incident Report, Dr. Lamar wrote that:

> I received a call from a colleague that indicated a post on social media that I needed to review from a teacher in the district that wrote a message about privilege that talked negatively about students in the district. On August 10, 2020, I received an additional text message from a Principal indicating I needed to review the social media about a teacher post at Pittsburgh Banksville. The Principal indicated concerns about the post and that this information was negative and that she works in our district.

(DSUMF ¶ 34.)

On August 10, 2020, at 2:52 p.m., George Allen a/k/a "George Justice" posted the following on Facebook:

> Denise who works for the [@]Pittsburgh Public Schools has an interesting concept of what Privilege is. We all know where she draws these damaging views and beliefs from and I'm curious how this would [a]ffect the children in which she engages with… Does anyone know Denise the Menace?

(the "Allen Post") (DSUMF ¶ 35.) Defendants describe Allen as a community member who has a large following on his social media account. The Allen Post identified Deltondo's Facebook profile, re-shared the Privilege Post, and identified Deltondo as a District teacher. This occurred before the District made any public statement about Deltondo's post. (*Id.* ¶¶ 36-37.)According to Defendants, a number of people commented on the Allen Post, raising concerns about the impact Deltondo's Privilege Post could have on students in the District and her ability to provide them with a bias-free education. One commentator to the Allen Post tagged local TV station WPXI.

Deltondo responded twice to the commenters on the Allen Post, saying:

> If you continue to slander me and make up false accusations I will be contacting my attorney.

> Look . . . you don't know me and I don't appreciate you making false accusations. You have no idea about what I do for my community and my students. . . .

(*Id.* ¶¶ 40-42.)

Ebony Pugh, the Director of Public Relations and Media Content, testified that "we were tagged and then we were tagged multiple times within [the Allen Post] – in different posts but also within that post – the reach of the post had grown." (*Id.* ¶¶ 43-48.) *See also* PCSMF ¶¶ 22-23.

Deltondo's LinkedIn page reflected her affiliation with the District and users located her LinkedIn page to express negative feedback. One user commented that "I can only imagine how she treats students and families who need that public assistance." Community member Verna F. messaged the District's "Let's Talk" support email saying that Deltondo "is allegedly a teacher in the [D]istrict and she needs to be FIRED! Our kids deserve better than this racist disrespectful individual in a position of authority over them. Nor should they be subjected to her undoubtedly biased behavior." (DSUMF ¶¶ 50, 56.)[9]

Colfax Principal Tamara Sanders Woods contacted Principal Fadick in response to concerns raised by at least two teachers and a parent whose children attended Colfax. Similarly, South Brook Principal Jennifer McNamara contacted Principal Fadick based on concerns about Deltondo's posts, and Banksville teacher Steve DeFilippo was alerted to the matter when another District teacher showed him the post. Dr. Lamar directed Principal Fadick to "stay out of it" and

---

[9] Deltondo objects to the LinkedIn comment because it is undated and unauthenticated. She adds that the comment from Verna F. was published after the District Statement was issued and that there is no evidence that she was a community member. (PRDSUMF ¶¶ 50, 56.)

said that she and human resources were taking care of it. (*Id.* ¶¶ 51-55.)

Deltondo disputes a number of the District's assertions, noting: (1) Fadick did not hear any direct complaints[10] about the Privilege Post and her testimony about "disruption" at Banksville Elementary related to the District's suspension of Deltondo, which forced the school to try to replace her at the beginning of the school year; and (2) most of the referenced posts were made after the District Statement described below was issued—and particularly after School Board member Kevin Carter posted the District Statement in the comments of the Allen Post—and were not from parents but rather from George Allen's followers. (PRDSUMF ¶¶ 36-37, 40-48, 50-56; PCSMF ¶¶ 25-26, 50-52.)[11]

Deltondo states that just two people (both George Allen followers) messaged the District before the District Statement was issued and only approximately thirteen people commented on the Allen Post before the District issued a statement. (PCSMF ¶ 30.)

### 4.    The District Statement

On August 10, 2020, Hamlet posted the following on Facebook and Twitter:

> We have been made aware of a social media post shared by a Pittsburgh Public Schools staff member that does not reflect the attitude or beliefs of our District. As leaders actively working against racist ideas and policies to ensure all students can experience a bias-free education, we take our responsibility as educators of our

---

[10] Deltondo argues that the declarations submitted regarding complaints forwarded to Fadick by others,: (1) are not "actually signed by the purported declarants in any verifiable way, but have instead have had [sic] italicized script typed into the signature line"; (2) rely on hearsay from persons not identified as having factual knowledge about the matter; and (3) do not specify the time frame in which the complaints were made. As to her first argument, and as her counsel is undoubtedly aware, both federal and state law allow electronic signatures on documents, regardless of the format of the script. *See* Fed. R. Civ. P. 5(d)(3); 73 P.S. § 2260.305. Her other arguments are addressed below.

[11] Deltondo also argues that George Allen is not a "community member," but a "left-wing extremist [with the tag-line "Death by Screenshot"] who makes it his mission to try to have people he disagrees with online fired." This distinction is irrelevant. Deltondo cites no authority for the distinction between "members of the community" and "extremists."

> young people seriously and remain committed to eliminating all forms of bigotry and racism in our public schools. As this personnel matter is currently under investigation, no further comment is available.

(the "District Statement") (DSUMF ¶¶ 57-58.)

The District Statement did not identify the "staff member," reference Deltondo's school or cite any other identifiable information about her. (DSUMF ¶¶ 59-60.) Deltondo notes, however, that Defendants knew that she was being identified online, by name and school, and the District was being tagged. Thus, although the District Statement did not identify her, Defendants knew that people who saw the statement online could recognize that it was about Deltondo. (PRDSUMF ¶¶ 59-60; PCSMF ¶ 17.)[12]

The District Statement was drafted by Pugh with input from Angela Allie ("Allie"), the Executive Director of Equity at the District. (DSUMF ¶¶ 63-65; PCSMF ¶ 21.) In reviewing the Privilege Post, Allie remarked to Pugh, "Oh wow . . . Denise went HAM! That's so racist!" (DSUMF ¶ 66; PCSMF ¶ 32.) Hamlet approved the Statement before it was issued. (PCSMF ¶ 35.)[13]

Defendants claim that the District Statement was issued in response to the negative comments it was receiving about Deltondo's Privilege Post and that no decisions were made about

---

[12] Although a local news director emailed Ebony Pugh ("Pugh"), the District's Director of Public Relations and Media Content, using Deltondo's name, Pugh did not give him Deltondo's name, respond with any information identifying her or discuss what further action the District might take. (DSUMF ¶ 71.) According to Deltondo, however, Pugh did provide WTAE with assistance about where to look for her name. (PRDSUMF ¶ 71; PCSMF ¶ 45.)

[13] Deltondo states that Defendants never produced any emails between Hamlet and Pugh regarding the District Statement and infers that the lack of production suggests that they may have been deleted. (PCSMF ¶ 36.) She requests that an adverse inference be drawn from this fact for purposes of this motion. (Id. ¶ 37.) Defendants counter that Deltondo cannot create a negative inference from the lack of documentation. (DRPCSMF ¶ 36.) The Court need not address this issue because the salient fact for purposes of this motion is that Pugh and Allie drafted the District Statement and Hamlet approved it.

Deltondo's conduct based on her words alone. (DSUMF ¶¶ 61-62.) Deltondo notes that the only discussion online was from George Allen and his followers, the Allen Post received only thirteen comments before the District Statement was issued and the District received only two messages, only one of which was actually critical, from George Allen's followers.

Further, Deltondo claims, the District violated its own policy against commenting on personnel matters and Hamlet, who signed the District Statement, was unable to explain why the District took this action, although he indicated that the Board demanded it. (PRDSUMF ¶¶ 61-62; PCSMF ¶¶ 18, 38-39.)[14] Hamlet acknowledged that the District could have simply issued a statement saying it was aware of the Privilege Post but that it could not comment on a personnel matter. (PCSMF ¶ 40.) Pugh admitted that "we were partially responding to the multiple tags [that were] being posted," that is, they were responding to tags by George Allen's followers who were offended by the "racist post." (PCSMF ¶¶ 22-23, 27, 31.)

Hamlet testified that Defendants viewed the Privilege Post as a criticism of the Black Lives Matter ("BLM") movement. He did not think such criticism was valid and believed criticism of BLM was enough in itself to justify punishing a teacher. (PCSMF ¶¶ 20, 43.)

Defendants cite the following comments regarding the District Statement that raised the District's concerns about the impact the Privilege Post could have on its students and Deltondo's ability to provide them a bias-free education:

- … I also know the long-term destruction a negative teacher can cause by possessing toxic ideas and corrosive biases towards children who cannot

---

[14] By contrast, Defendants take the position that the Board had nothing to do with issuing the District Statement and was not placed on notice of it until after it was issued. (DSUMF ¶¶ 72-75.) But Hamlet testified that the Board wanted a statement to be issued. (PRDSUMF ¶ 72.) Defendants also contend that Deltondo has produced no evidence that any District policy prevents comment on personnel matters. (DRPCSMF ¶ 38.) Notably, the District Statement stated that "As this personnel matter is currently under investigation, no further comment is available" and Hamlet testified that this was a District policy. (Hamlet Dep. 110:1-6) (ECF No. 233-4.)

defend themselves. The comments of Denise Deltondo were not only toxic, but dangerous and it's clear that former colleagues and current individuals that engage with her agree that her personality is a nuisance to a healthy, productive learning environment….

- If that is the lens she clearly sees black people through imagine the disparity of treatment imposed on students down through the years and all of the lives affected. I guarantee if you look into the records of the students in her care she had inflicted more harsh consequences, tougher grading, etc etc on black students. I've already seen commentary from black past students going back more than 10 years saying how they remember how she made them feel and they could just tell she hated them even back then. This is sickening!

- This is not her first time, she was one of my children's teacher and she and I had run ins based on her behavior towards my daughter (she is now 30), for her to still be teaching is crazy.

- It was a teacher whom (sic) felt it was her place to speak on what privilege is while degrading the poor and gas lighting people of color.

(DSUMF ¶ 67.)[15]

Board President Wilson testified that she had no discussions with Board members about Deltondo, her re-post, the investigation, or the District Statement. Further, the Board did not receive a copy of any social media posts containing Deltondo's name or picture. (DSUMF ¶¶ 76-77.) However, Board member Kevin Carter began posting the District Statement on George Allen's social media post about Deltondo as soon as it was issued. (PRDSUMF ¶ 77; PCSMF ¶ 33.) Defendants state that there is no evidence that Carter did so as part of his duties as a Board member or that anyone reading his comments would have known he was a Board member. (DRPCSMF ¶ 33.) But in response to a question as to whether Deltondo had been fired, Carter wrote, "the district is looking into it . . . that's all I know at the moment. As it is a personnel issue

---

[15] Deltondo notes that these comments were made after the District Statement was issued and Defendants never suggested that they took any action on statements relating to incidents that allegedly occurred years before the Privilege Post was made. (PRDSUMF ¶ 67.)

I am not permitted to discuss." (ECF No. 228-7 at PPS000929.)

After the District Statement was issued, there were more posts and comments about this matter and Deltondo. (PCSMF ¶ 34.)[16] Television news stations aired news reports about the District Statement and mentioned Deltondo by name. (*Id.* ¶ 46.)

### 5.  Deltondo Is Placed on Paid Administrative Leave

On August 11, 2020, Deltondo received a letter from Waskowicz that stated:

> It was reported to Employee relations that you posted a message via social media that does not reflect the attitude or beliefs of the District and contravenes the District's mission to actively work against racist ideas and policies to ensure all students can experience a bias-free education.

> This correspondence serves as notification that the District is placing you on a paid administrative leave effectively immediately pending our investigation into this matter.

(DSUMF ¶¶ 78, 80.)[17] The Board was informed of this action. (DSUMF ¶ 83.)

According to Defendants, social media comments about her Privilege Post, discussions with leadership and reports to Principal Fadick formed the basis of the District's decision to place Deltondo on leave. The "attitudes and beliefs" referred to in the letter come from the Code of Conduct[18] that includes an expectation that educators will ensure that students learn in a bias-free

---

[16] According to Defendants, there is no evidence that people were even aware of the District Statement (DRPCSMF ¶ 34). However, it appears in the comments. (ECF No. 228-7 at PPS0949).

[17] Defendants state that paid administrative leave is a "non-disciplinary measure implemented before the due process meeting" and that they placed her on it to "hit pause" and have a discussion but no decisions had been made. (*Id.* ¶¶ 79, 98.) But Deltondo notes that no evidence supports Defendants' claim and as a matter of law, a plaintiff does not have to suffer a disciplinary measure to maintain a First Amendment retaliation claim. (PRDSUMF ¶¶ 79, 98.) This issue is discussed below.

[18] Waskowicz was relying on an earlier version of the Code of Conduct then in effect. The Code was amended on August 21, 2021 and now states that teachers "Shall exhibit consistent and equitable treatment and shall not unlawfully discriminate against students." 22 Pa. Code § 235.5a(b)(6).

environment. (DSUMF ¶¶ 81, 84-88, 96.)[19]

Deltondo disputes these statements. She notes that Principal Fadick never claimed that she was the recipient of any concerns about Deltondo and there is no evidence that any complaints to Fadick were relayed to anyone. Further, she notes, the Code of Conduct does not on its face apply to out-of-school conduct and its provisions were never mentioned in the District Statement or the emails that Pugh and Allie exchanged as they were drafting the District Statement. (PRDSUMF ¶¶ 81, 84-88, 96.) Further, the letter suspending her did not discuss or imply any actual or potential disruption to school operations. (PCSMF ¶ 49.)

### 6. The Due Process Meeting

On September 17, 2020, a Due Process Meeting with Deltondo was conducted over Zoom. Waskowicz and City Solicitor Ira Weiss represented the District. Deltondo attended with counsel, but did not invite her union representative to attend. (DSUMF ¶¶ 102, 109-10; DRPSCMF ¶ 56; PCSMF ¶ 53.) Deltondo asserts that she was not told before or during that meeting the nature of the charges or the nature of any policy she violated that warranted indefinite suspension. (PCSMF ¶ 54.)

Deltondo admitted during the meeting that she reshared the Privilege Post. (DSUMF ¶ 111.) The parties vigorously dispute what else occurred. According to Defendants, Deltondo was asked what the Privilege Post was about and she said it was about her daughter. Waskowicz then

---

[19] Defendants reference statements made by Waskowicz, their Rule 30(b)(6) witness, to the effect that the Privilege Post "could have an impact on the student body" and "perpetuates race-based stereotypes" and that most of the comments to the District related to how the Privilege Post "could impact students, not as disagreements with political views." (DSUMF ¶¶ 90-92, 95.) As Deltondo notes, these are not "facts" but opinions. At any rate, many of the comments refer to Deltondo as "privileged," a "Trump Girl," a racist and a "MAGAt" who hates the poor. (PRDSUMF ¶¶ 90-92, 95; PCSMF ¶ 29.)

went line by line through the Privilege Post and asked if each line was about her daughter. Deltondo said "no" and eventually said it was about "youth in general." Deltondo was then asked whether she could potentially view how the Privilege Post might perpetuate race-based stereotypes or might impact District students who utilize public assistance, to which she said she could not. According to Defendants, Deltondo said the Privilege Post had nothing to do with race and she could not perceive how anyone could think that it did. At no point did Deltondo indicate that the Privilege Post was about her opposition to the "welfare state." (DSUMF ¶¶ 112-16, 118.)

In contrast, Deltondo asserts that she told Waskowicz only that she was thinking privately about her daughter[20] when she reshared the Privilege Post. She asserts that Waskowicz "was behaving in an unprofessional and uncontrolled manner, furious that [she] would not admit she was racist." Her social media posts contained endorsements of the political content of the underlying post, which were obvious criticisms of the welfare state. (PRDSUMF ¶¶ 112-16, 118; PCSMF ¶ 55.) Waskowicz was focused on the content of the speech and demanding that Deltondo admit that it was offensive. (PCSMF ¶ 56.) Waskowicz did not raise any real or potential disruption to school operations. (*Id.* ¶ 57.)[21]

According to Defendants, the Due Process Meeting is used to determine whether any sort

---

[20] The parties agree that the District was unaware of what Deltondo was thinking when she made the Privilege Post. (DSUMF ¶ 119; PRDSUMF ¶ 119.)

[21] Defendants point to another portion of Deltondo's deposition in which she appears to testify that she remembers virtually nothing about the Due Process Meeting. (DRPCSMF ¶ 57) (citing Deltondo Dep. 63:24-25) ("Only thing I remember is being yelled at, at the meeting to be honest.") However, these inconsistencies represent an issue of credibility for the jury to resolve at trial. *See Mest v. Cabot Corp.*, 449 F.3d 502, 514 (3d Cir. 2006) (holding that while the credibility of contradictory deposition testimony may be disputed, the summary judgment standard requires a court to look at all facts in the light most favorable to the non-moving party and reserve the issues of credibility for a jury).

of restorative practices can be implemented. In the past, District employees said "worse things" than Deltondo and were disciplined but remained teachers in the District. Here, however, they claim that the District "did not have an ability to restore anything because [it was] told that this post was about Ms. Deltondo's daughter." Waskowicz states that it was Deltondo's lack of credibility about the Privilege Post that was the most disconcerting. (DSUMF ¶¶ 121-26.)

Deltondo notes that there is no evidence to support the claim that the Due Process Meeting was about "restorative practices" and this was not raised in any form. Rather, as she describes it, Waskowicz's behavior at the meeting was "unhinged" as she yelled at Deltondo and badgered her to admit she was a racist. (PRDSUMF ¶¶ 121-26.)[22]

Thereafter, Deltondo was kept on paid administrative leave for 4.5 months, ostensibly so that the District could conduct an investigation, but that no investigative steps were actually taken during this time. (PCSMF ¶ 58.)[23]

### 7. Statement of Charges

At a meeting on December 16, 2020, the Board approved a resolution confirming its receipt of sufficient evidence to justify the issuance of a Statement of Charges against Deltondo and notice of Board Hearing. The District sent Deltondo and the union the Statement of Charges six days later. The notice stated that a Board Hearing would be held on January 7, 2021 to determine whether she should be terminated from her employment with the District. The Statement of

---

[22] The Court is not permitted on summary judgment to make credibility determinations or resolve disputed facts. Thus, as Deltondo is the non-moving party, her version of events must be accepted. Moreover, Defendants have not explained how Waskowicz determined that Deltondo "lacked credibility." That is, even if Waskowicz disputes Deltondo's version of events, she has no basis for concluding that Deltondo did not believe what she was saying.

[23] While Defendants "object" to this statement (DRPCSMF ¶ 58), they do not provide any information about any other steps that may have been taken during this time.

16

Charges also informed Deltondo that she was suspended from her duties without pay effective December 17, 2020. (DSUMF ¶¶ 127-30; PCSMF ¶ 59.)[24]

The Statement referenced Section 1122 of the Code of Conduct and included charges of: "immorality; incompetency; intemperance; cruelty; persistent negligence in the performance of your duties; willful neglect of your duties; persistent and willful violation of or failure to comply with school laws of this Commonwealth, including official directives and established policy of the Board of School directors" based on her sharing of the Privilege Post, which the Statement referred to as a "racist post." (ECF No. 228-4 Ex. 6 at 1.)[25]

The Statement of Charges further stated that, "during your September 17, 2020 due process meeting, you exhibited a lack of contrition, a lack of awareness, and a lack of candor about the foreseeable negative impact sharing this racist meme would have on your students, colleagues, and this School District, which not only raises further doubts about your professional judgment, but also your integrity." (DSUMF ¶ 133.) It does not reference any DEI policies or programs. (*Id.* ¶ 134.) Deltondo notes that this is the first time the issue of disruption was raised. (PCSMF ¶ 61.)[26]

### 8. Postponement of Hearing; Deltondo Resigns

Deltondo obtained new counsel, who requested a postponement of the hearing. On January

---

[24] Defendants state that the letter was drafted by outside counsel. (DSUMF ¶¶ 131, 136). It was signed and therefore approved by Board President Sylvia Wilson. (PRDSUMF ¶¶ 131, 136; PCSMF ¶ 72.)

[25] See 24 P.S. § 11-1122(a).

[26] Deltondo states that the Statement of Charges brings numerous charges never previously raised or mentioned during the process, including immorality, incompetency, intemperance, cruelty, persistent negligence in the performance of duties, willful neglect of duties, and persistent and willful violation of school laws. (*Id.* ¶ 63.) Defendants respond that the charges employed "legal terms of art" based on the Code of Conduct. (DRPCSMF ¶ 63.)

14, 2021, Deltondo's counsel sent a letter to the School Board and its members that objected to the Statement of Charges and demanded her immediate reinstatement with a clean record, a name-clearing hearing, $1 million in damages, a full public apology and "annual civics lessons for all Pittsburgh public school staff, board, and students to ensure that his never happens again." There was no substantive response to this correspondence. (DSUMF ¶¶ 137-46; PCSMF ¶ 73.)

The hearing was rescheduled for March 18, 2021. Two days before the rescheduled hearing, Deltondo's counsel directed a letter to the School Board advising the Board that Deltondo was resigning her employment immediately. As a result, the hearing was canceled. (DSUMF ¶¶ 147-54.)

### C. Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial

and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Fed. Rsrv. Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Fam. YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

**D.  Discussion**

Deltondo's civil rights claims are asserted under 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). *See also Baker*, 443 U.S. at 140; *Graham v. Connor*, 490 U.S. 386, 394 (1989).

The sole remaining claim here is a violation of the First Amendment, which, among other things, prohibits retaliation for exercising free speech rights.

1.  First Amendment Claim

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const... Amend. 1. "First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 n.43 (1982).

Deltondo contends that she was subjected to retaliation based on her free speech in three respects: (1) on August 10, 2020, Defendants issued the District Statement, making a public

comment about a personnel matter and attacking her for her speech because they disagreed with its content; (2) the next day, they placed her on indefinite leave to investigate the matter but no investigation took place over the next 4.5 months; and (3) on December 22, 2020, they issued a Statement of Charges, placed her on unpaid leave and recommended her dismissal.

The Supreme Court has held that "a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Id.* at 384. Nevertheless, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will County, Ill.*, 391 U.S. 563, 568 (1968).

In *Pickering* and later cases, the Supreme Court applied a three-part test to determine whether a public employee's speech is protected. As discussed by the Third Circuit: "first, the employee must speak as a citizen, not as an employee … second, the speech must involve a matter of public concern …; and third, the government must lack an 'adequate justification' for treating the employee differently than the general public based on its needs as an employer under the *Pickering* balancing test." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 987 (3d Cir. 2014). As noted in *Dougherty:*

> "Under *Pickering*, we must 'balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' 391 U.S. at 568, 88 S.Ct. 1731. The more tightly the First Amendment embraces the employee's speech, the more vigorous a showing of disruption must be made by the employer.

*Id.* at 991. Whether the speech was protected is a question of law. *Id.* at 987.

In this case, Defendants challenge all three elements of the *Pickering* test.

### a.   Was it Speech by a Private Citizen or an Employee?

Defendants contend that Deltondo was speaking as an employee and not as a private citizen. This argument fails to withstand scrutiny.

"Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Pickering*, 391 U.S. at 572.

As documented above, Deltondo made the Privilege Post over the summer vacation. Her school was not in session and she was not performing any duties for the District. Indeed, her employment duties did not include posting comments on her private Facebook account that did not identify her as a teacher. *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy.") Rather, Deltondo engaged in activity in which private citizens engage; that is, posting or reposting comments on Facebook and Instagram.

That the Privilege Post mentioned children receiving a free breakfast (which was something Deltondo managed as part of her duties) and some of her Facebook friends were teachers does not transform the Privilege Post into speech by an employee. Nor does the fact that George Allen and his followers (or indeed the public generally) were offended by the Privilege Post transform Deltondo's speech into part of her official duties. Therefore, she was speaking as a private citizen, not as an employee.

### b.   Was the Speech a Matter of Public Concern?

"Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). "The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin*, 483 U.S. at 387. *See also Matal v. Tam*, 582 U.S. 218, 223 (2017) ("Speech may not be banned on the ground that it expresses ideas that offend."); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("the advocacy of a politically controversial viewpoint … is the essence of First Amendment expression.")[27]

Defendants argue that, during her Due Process Meeting, Deltondo claimed that she had her daughter in mind when she published the Privilege Post. According to Defendants, she told Waskowicz that she could not view how the Post might perpetuate race-based stereotypes or might impact District students who utilize public assistance and asserted that it had nothing to do with race or finance because it was about her daughter. Defendants contend, therefore, that her speech was not on a matter of public concern but on a personal issue which is not protected. *See Connick*, 461 U.S. at 147 ("when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual

---

[27] Deltondo claims that *Flanagan v. Munger*, 890 F.2d 1557, 1564 (10th Cir. 1989) holds that when a court determines that the plaintiff is not speaking "as an employee," it need not address the public concern element. In fact, however, the court actually held that "the public concern test does not apply when public employee nonverbal protected expression does not occur at work and is not about work." Thus, *Flanagan* is distinguishable from the facts in this case, and at any rate, Deltondo has cited no Third Circuit decisions that support this conclusion.

circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.")

There are two problems with this argument, however. First, it is based solely on Waskowicz's version of what was said during the Due Process Meeting, a version that Deltondo disputes. Deltondo asserts that she only thought privately about her daughter when she made the Privilege Post but also liked the political and social messages in the original post. She claims that during the Due Process Meeting Waskowicz yelled at her and demanded that she admit to being a racist. These material disputed facts must be viewed in the light favorable to Deltondo, the non-movant.

In addition, as Deltondo observes, the Due Process Meeting took place on September 17, 2020, which was after the District issued the District Statement and suspended Deltondo. Defendants do not claim that it was their understanding before the hearing that Deltondo was thinking only of her daughter when she made the Privilege Post.

Simply put, what matters is the employer's reason for its actions, not what the employee was privately thinking. When an employer takes action against an employee based on the employee's exercise of First Amendment rights, "the employee is entitled to challenge that unlawful action under the First Amendment and 42 U.S.C. § 1983—even if, as here, the employer makes a factual mistake about the employee's behavior." *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 273 (2016).

In support of their position that Deltondo's speech was not on a matter of public concern, Defendants cite *McWilliams v. Frankton-Lapel Cmty. Schools*, 2022 WL 17605393 (S.D. Ind. Dec. 12, 2022). In that case, a teacher was terminated after she wrote a private Facebook comment criticizing a student leadership program ("Leader in Me" or "LIM") implemented in her school.

As the court found, the speech was not protected because the school reasonably believed that she made factually false statements about the program, including: "Teachers are even being evaluated on how well they implement [LIM]"; "We are being advised & graded on how well we use the program"; and "Next we will mentor another school to begin using LIM." *Id.* at *7.

Deltondo did not make any factual statements, true or otherwise, about programs in the District. Indeed, it could be argued that she made no factual statements at all. Rather, she shared and approved of a post from someone else that included opinions critical of the actions of some members of society and perhaps, critical of some programs. *McWilliams* fails to support a finding that Deltondo's speech was not protected.[28]

Moreover, there are a number of decisions in which courts have found speech by teachers to be about a matter of public concern, even when such speech was objectively offensive. *See, e.g.*, *Monroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 459-60 (3d Cir. 2015) (teacher referred to her own students using terms such as "dunderhead," "rat-like," "sneaking, complaining, jerkoff," "frightfully dim," "dresses like a street walker," "liar and cheater," and "utterly loathsome in all imaginable ways."); *Thompson v. Cent. Valley Sch. Dist. No. 365*, 163 F.4th 654, 664-65 (9th Cir. 2025) (middle school assistant principal made a Facebook post about the Democratic National Convention using the disability-related slur "demtard" and threatening to take individuals "to the woodshed for a proper education"); *MacRae v. Mattos*, 106 F.4th 122, 139 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2617 (2025) (high school teacher posted six controversial memes on her personal TikTok account that denigrated the identities of LGBTQ students); *Craig v. Rich Township High*

---

[28] The *McWilliams* court also noted that, "The employer's belief about the truth of the comment is not one of the seven enumerated 'Pickering factors,' but the Seventh Circuit has recognized 'the truth or falsity' of the speech may, at times, 'be the decisive factor in the *Pickering* balance.'" *Id.* at *6 n.4 (citation omitted). Defendants cite no authority that the Third Circuit has adopted this approach.

*School District* 227, 736 F.3d 1110, 1116-18 (7th Cir. 2013) (school guidance counselor published a book that repeatedly discussed sexually provocative themes and used sexually explicit terminology.); *Melzer v. Bd. of Education*, 336 F.3d 185, 196 (2d Cir. 2003), (high school science teacher fired after writing about his membership in the North American Man/Boy Love Association).

Thus, the Court concludes that Deltondo's comments were on a matter of public concern.

### c.  Applying the Pickering Balancing Test

Defendants argue that, even if Deltondo's speech can be considered speech by a private citizen relating to a matter of public concern, her interest in free speech is outweighed by the District's interests in promoting the efficiency of its public services and avoiding disruption in the school.

Deltondo counters that she was not notified about any claimed "disruption" until the Statement of Charges was issued and even then, without any substantiation. She further contends that the record demonstrates that only a few comments were made in response to her Privilege Post, they came from George Allen and his followers, and comments increased after Defendants issued the District Statement, but none of these facts demonstrates the existence of "disruption."

As the Court of Appeals has noted on the issue of disruption:

> While the test for disruption varies depending upon the nature of the speech, the factors a court typically considers include whether the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891.

*Dougherty*, 772 F.3d at 991. In every case, "Some disruption is almost certainly inevitable; the point is that *Pickering* is truly a balancing test." *Id.* at 993.

In *Munroe v. Central Bucks School District*, 805 F.3d 454 (3d Cir. 2015), the Court of

Appeals affirmed the district court's grant of summary judgment against plaintiff Monroe, a teacher who was suspended and later terminated based on a blog in which she criticized her students. As the court noted, witnesses testified that, after Monroe published a series of inflammatory blog posts, some of which essentially identified individual students, calls, and emails came pouring in, the school was "like a ticking time bomb" and it was "so incendiary" that the administration "thought [they were] going to have a riot or sit-in or worse." Monroe was escorted from the building for her own safety and the school received over 200 requests from parents to opt their children out of her class. *Id.* at 462.

Although Monroe's speech was mostly about her personal gripes, the court nevertheless concluded that it touched on enough broader issues to meet the "public concern" requirement. *Id.* at 470-72. In any event, the court concluded that "the speech was likely to cause—and, in fact, did cause—disruption, and that, under the circumstances, the School District's interest outweighed Monroe's interest, as well as the interest of the public, in her speech." *Id.* at 466. As the Third Circuit explained:

> "On the employee's side of the scale, we must consider the interests of both plaintiff and the public in the speech at issue." *Dougherty*, 772 F.3d at 991. On the other side of the *Pickering* balancing test, the Court must address "the government's legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.' " *Id.* (quoting *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005)). The government need not show the existence of actual disruption if it establishes that disruption is likely to occur because of the speech. *See, e.g., id.* at 992 & n.7. While the inquiry varies given the nature of the speech at issue, courts typically consider whether the speech impairs discipline or employee harmony, has a detrimental impact on close working relationships requiring personal loyalty and confidence, impedes the performance of the speaker's duties, or interferes with the enterprise's regular operations. *See, e.g., id.* at 991. "The balancing we must undertake is a fact-intensive inquiry that requires consideration of the entire record, and must yield different results depending on the relative strengths of the issue of public concern and the employer's interest." *Miller [v. Clinton Cnty.]*, 544 F.3d [542,] 548 [(3d Cir. 2008)]. In short, the inquiry "involves a sliding scale," in which "the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to

the public." *Id.* at 549 n.2; *see also, e.g., Dougherty*, 772 F.3d at 991 ("The more tightly the First Amendment embraces the employee's speech, the more vigorous a showing of disruption must be made by the employer.").

*Id.* at 472.

The *Munroe* court determined that the interests of Monroe and the public in her speech were entitled to (at best) only minimal weight under the *Pickering* balancing test because, unlike the business and operations officer who exposed the superintendent's alleged misconduct in *Dougherty*, she was primarily engaged in airing her personal gripes. As such, the Court of Appeals concluded that even assuming her speech "possessed the highest value," Defendants met their burden to show that her speech was "sufficiently disruptive so as to diminish any legitimate interest in its expression, and thus her expression was not protected.'" *Id.* at 473. "Invective directed against the very persons that the governmental agency is meant to serve could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations." *Id.*

As the Third Circuit highlighted, the role of a public school teacher involves a special set of responsibilities and circumstances, including a level of public trust not present in many other public employment positions and a unique relationship between teacher and student. *Id.* at 475-6. Thus, the court found that "Monroe's various expressions of hostility and disgust against her students would disrupt her duties as a high school teacher and the functioning of the School District." *Id.* at 476.

Defendants cite other cases with similar results. *See Thompson*, 163 F.4th at 665-66 (prediction of disruption was not based on "rank speculation or bald allegation" given that the school "reasonably predicted that a Facebook post by a school administrator using disability-related slurs and violent language was likely to disrupt CVSD operations" ); *Hedgepeth v. Britton*,

152 F.4th 789, 796-97 (7th Cir. 2025) (First Amendment rights of teacher who posted derogatory comments posted on Facebook outweighed by school's interests when the posts sparked outrage, resulted in over 135 emails about her posts, drew media attention and forced District to employ a costly public relations response); *MacRae*, 106 F.4th at 139 (First Amendment rights of high school teacher fired after posting six controversial memes on her personal TikTok account that denigrated the identities of LGBTQ students were outweighed by school district's interests) *Durstein v. Alexander*, 629 F. Supp. 3d 408, 423-25 (S.D.W. Va. 2022) (First Amendment interests of teacher fired for making social media posts containing derogatory comments about Muslims were outweighed by school's interests.)[29]

The facts here differ significantly from those of the cases cited by Defendants. First, Deltondo did not make overtly derogatory comments about the Kindergarten students in her classes. Certainly, she endorsed the views in the post she reposted, but given the entire circumstances, the record does not reflect sufficient evidence to demonstrate that actual disruption occurred. Defendants have not established that Deltondo's actions impaired discipline or employee harmony, negatively impacted working relationships, impeded Deltondo's performance of her duties or significantly interfered with the District's regular operations. The Privilege Post was made during summer vacation. While there was some public reaction, Defendants have not claimed that there was an outcry by multiple parents or school employees. Principal Fadick received no direct complaints and the only support Defendants have of complaints made to the

---

[29] Other relevant decisions have yielded different results. *See Jorjani v. New Jersey Inst. of Tech.*, 151 F.4th 135, 143 (3d Cir. 2025) (no evidence of disruption when university lecturer made private comments about race, politics, and immigration outside the classroom and off campus and university received a few calls and fifty emails in response from a few students and alumni); *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 782-83 (9th Cir. 2022) (after teacher brought a "MAGA" hat to a training session, fewer than five fellow teachers were upset and there was no evidence that it interfered with his ability to perform job or affected regular operation of school).

District consists of declarations from principals of other schools claiming that a few complaints were made to them. But even if these complaints are acknowledged,[30] they do not demonstrate disruption of school operations. In fact, the complaints came primarily not from concerned parents or District employees but from George Allen and his followers. The comments increased after the District chose to issue a public statement. And as the court explained in *Munroe*, the concerns of a few members of the community cannot be used to outweigh Deltondo's free speech interests.

Moreover, Principal Fadick testified that any "disruption" was caused by the District's suspension of Deltondo, which required the hiring of last-minute replacements for her. This was the result of the District's actions, not of Deltondo's speech. In *Dougherty*, the Court of Appeals held that a jury could conclude that Dougherty's speech would have made only a minimal disruption had the School District not subsequently engaged in a series of actions in an attempt to suppress the plaintiff speech that actually caused the disruption. 772 F.3d at 992 (citation omitted). Similarly, even if evidence of some disruption is presented at trial, a reasonable jury could conclude that Deltondo's speech would have made only a minimal disruption if the District had not issued the District Statement.

Nor has the District established that there was any significant possibility of disruption. As discussed, the post was made during summer vacation and there is no conclusive evidence that disruption to the District generally or to Deltondo's class or the school in which she taught was

---

[30] Assuming for purposes of this opinion the admissibility of declarations submitted by Defendants, Declarant Sanders Woods states that she heard from "two teachers and a parent" but does not identify the speakers. Woods also states that she had the "impression that the teachers and parent contacted me based on concerns that the language in Ms. Deltondo's post could be interpreted as her having a negative bias against children of minority backgrounds" but does not state that they actually expressed such concerns. (ECF No. 228-11 ¶¶ 2-3.) Declarant McNamara states that she was contacted by her friend and District teacher Becky Gaertner but does not say that Gaertner raised a complaint about the Privilege Post (and Deltondo asserts that Gaertner was not identified as a person who possesses knowledge about this matter). (ECF No. 228-10 ¶ 2.)

likely to occur.

Thus, given the interests of Deltondo in expressing her speech and the limited evidence of any actual or possible disruption, the *Pickering* balancing test weighs in favor of Deltondo.

2. Other Arguments

Defendants also argue that Deltondo's Privilege Post was not a substantial or motivating factor in the District's actions. Their position is based on various contentions, including that paid leave is not disciplinary, Deltondo received due process and resigned before the Board hearing could be held. They also assert that the unpaid suspension was based on her refusal to acknowledge how her speech might affect children in the District, the Statement of Charges is not determinative but only a "notice" instrument and no viewpoint discrimination occurred.

Paid leave does not have to be "disciplinary" to be actionable in a retaliation case. On the contrary, the Court of Appeals has held that:

> Even "an act of retaliation as trivial as failing to hold a birthday party for a public employee," if "intended to punish her for exercising her free speech rights," may be actionable if under the circumstances it would be sufficient to "deter a person of ordinary firmness" from exercising his or her First Amendment rights. *Suppan v. Dadonna*, 203 F.3d 228, 234-35 (3d Cir. 2000) (citing *Rutan v. Republican Party*, 497 U.S. 62, 76 n.8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)). A First Amendment retaliation claim will lie for any individual act which meets this "deterrence threshold," and that threshold is very low: as we said in *Suppan*, a cause of action is supplied by all but truly de minimis violations. *Id.*

*O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006); *see also Barry v. Luzerne Cnty.*, 447 F. Supp. 2d 438, 450 (M.D. Pa. 2006).

As to the District's claim that Deltondo received due process and failed to admit how her speech may have impacted children in the District, there are material disputed issues of fact about what occurred during the Due Process Meeting. Further, Defendants' arguments with respect to the Statement of Charges and the unpaid suspension are unsupported by the record. Although the

Statement noted that it was "also" based on Deltondo's behavior at the Due Process Meeting, the primary reason for the Statement and the unpaid suspension was the Privilege Post.[31] Therefore, it constituted retaliatory action.

Moreover, as Deltondo observes, Defendants offer no support for the claim that the Statement of Charges was "merely a notice instrument" and many of the charges themselves are—to say the least—far removed from Deltondo's posting of a controversial comment. Defendants have not explained how Deltondo engaged in "immorality," "incompetency," "intemperance," "cruelty," "persistent negligence in the performance of duties," "willful neglect of duties" or "persistent and willful violation of school laws." Moreover, the Statement of Charges explicitly notified Deltondo that she was being suspended without pay pending a Board Hearing to determine whether she would be terminated. To call this document a "notice instrument" suggests that it did not affect her employment, which is clearly not the case.

Deltondo also asserts that the District's response demonstrates that it was engaging in viewpoint discrimination, disfavoring her speech because it found the Privilege Post contrary to its pro-BLM position. Defendants contend that Deltondo's argument is unsupported, but they cannot dispute that Hamlet testified that he considered criticism of BLM sufficient to warrant discipline. As courts have held, "viewpoint-based government regulations on speech are nearly always presumptively suspect." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 108 (3d Cir. 2022) (citation omitted). In that case, the Port Authority tried to

---

[31] In their brief, Defendants argue that "the Statement of Charges was issued based, not on the content of Ms. Deltondo's speech, but rather, the reasonable determination that Ms. Deltondo was not being truthful during the Due Process Meeting." (ECF No. 226 at 26.) In their Concise Statement, however, they acknowledge that the Statement was based only "in part on her demeanor during the September 17, 2020 due process meeting." (DSUMF ¶ 133.) And the Statement itself, which is part of the record, demonstrates that Defendants' position is unfounded.

preclude its employees from wearing masks with messages supportive of BLM and pointed to some online comments as evidence of disruption. Judge Ranjan disagreed:

> the Court does not find this to be persuasive evidence of potential disruptiveness for purposes of a *Pickering* analysis. The posts in question are few in number and reflective of only generalized displeasure or disagreement between employees. Moreover, the Court is loath to allow the restriction of public-employee speech based on a few social-media posts by individual employees, and the largely imaginary concern that ill-considered or hyperbolic online communications will extend into the workplace.

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 513 F. Supp. 3d 593, 614-15 (W.D. Pa. 2021) (record citations omitted).[32]

Finally, Defendants contend that they would have taken the same actions irrespective of the Privilege Post, but as Deltondo notes, this argument defies logic. There is no evidence that she engaged in any other acts that might warrant disciplinary action. As a result, the paid leave, unpaid leave, and Statement of Charges would not have occurred but for her speech.

### 3. Individual Defendants

The Court of Appeals has held that "to be liable under § 1983, each individual defendant "must have personal involvement in the alleged wrongdoing." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and

---

[32] Defendants repeatedly refer to Deltondo's "lack of candor" during the Due Process Meeting. But as noted above, even if the Court were to accept Waskowicz's version of what Deltondo said—which it cannot do on summary judgment—Defendants have not explained how they arrived at this conclusion. Even if it was undisputed that Deltondo stated she could not potentially view how the Privilege Post might perpetuate race-based stereotypes or affect District students who use public assistance, what basis did Defendants have for deciding that she was being untruthful? In other words, if Defendants cannot discipline Deltondo for expressing a point of view contrary to one held by the District, then they cannot do so for her "lack of candor" when she did not acknowledge their point of view either.

acquiescence." *Rode*, 845 F.2d at 1207. These allegations must be made with appropriate particularity. *Id.* Further, "a civil rights complaint is adequate where it states the conduct, time, place, and persons responsible." *Evancho*, 423 F.3d at 353. Moreover, in a civil rights case, "liability cannot be predicated solely on the operation of *respondeat superior*." *Rode*, 845 F.2d at 1207.

Defendants argue that Hamlet should not be held liable for the District Statement that was issued in his name and that the Board should not be held liable for the Statement of Charges that was signed by its president, Sylvia Wilson. Regardless of whether other individuals were involved in drafting these documents, they were ratified by Hamlet and Wilson on behalf of the Board, respectively, when they signed them. They cannot avoid potential liability on this basis.

As it relates to Waskowicz, Deltondo argues that she wrote the August 11 letter, was the principal person involved in the September 17, 2020 hearing and demanded that she admit to being a "racist" in connection with her suspension.

Thus, for purposes of a summary judgment motion, the record contains sufficient evidence of the personal involvement of the Hamlet, the Board, and Waskowicz with respect to Deltondo's First Amendment claim.

### 4. Qualified Immunity

Waskowicz and Hamlet alternatively assert that they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is an objective decision to be decided by the court as a matter of law. *Carswell v. Borough of Homestead*, 381

F.3d 235, 242 (3d Cir. 2004). The burden of pleading a qualified immunity defense rests with the defendant, not the plaintiff. *Thomas v. Indep. Twp.*, 463 F.3d 285, 293 (3d Cir. 2006). "The burden of establishing entitlement to qualified immunity is [also] on [the defendant]." *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The ultimate question is whether the state of the law when the offense occurred gave a defendant "fair warning" that his or her acts were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

In conducting this analysis, the Court should look first to applicable Supreme Court precedent. "Even if none exists, it may be possible that a 'robust consensus of cases of persuasive authority' in the Court[s] of Appeals could clearly establish a right for purposes of qualified immunity." *Mammaro v. New Jersey Div. .Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (quoting *Taylor v. Barkes*, 575 U.S. 822, 826 (2015)). Defining the right at issue is critical to this inquiry. The court must frame the right "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted). But this does not mean that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful. The Supreme Court has explained that "[a]lthough earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope*, 536 U.S. at 741. Indeed, the Court has made clear that

"officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.*

Deltondo argues that it was clearly established when these events occurred that she could not be retaliated against for exercising her First Amendment right to free speech. In turn, Defendants reference *Thompson*, in which the district court found that "it was not clearly established that placing an employee on administrative leave in response to a Facebook post that contained derogatory language embedded within a political post would constitute an adverse employment action for First Amendment purposes." *Thompson v. Cent. Valley Sch. Dist. No. 365*, 2024 WL 3836716, at *9 (E.D. Wash. Aug. 15, 2024). That said, Deltondo's post did not contain any "derogatory language," merely an opinion with which Defendants disagree. Moreover, on appeal, the Ninth Circuit affirmed on the basis that no constitutional violation occurred. 163 F.4th at 667. In this case, for the reasons explained above, the Court cannot reach that conclusion.[33]

Here, Defendants have not established that, in 2020, school officials could have reasonably believed that placing a teacher on indefinite leave and issuing a Statement of Charges in preparation for terminating her employment because of speech she made in a private social media post did not violate her First Amendment rights in the absence of a reasonable demonstration of or expectation of disruption. "Since at least 1967, it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in

---

[33] Defendants also cite a case in which the court concluded that a principal was entitled to qualified immunity with respect to a First Amendment retaliation claim brought by a teacher because the evidence demonstrated "that a reasonably competent principal would not have been on notice that Agosto's speech was on a matter of public concern." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020). This was because his speech related to the principal's failure to comply with the collective bargaining agreement, failure to give him copies of the school budgets and attempting to have Agosto replaced as union chapter leader. *Id.* at 95-97. In this case, for the reasons explained above, Deltondo's speech was about a matter of public concern.

freedom of expression." *Dougherty*, 772 F.3d at 993 (citing *Connick*, 461 U.S. at 142). The court further stated that: "While it is true that both *Garcetti* and *Pickering* are fact-dependent inquiries, giving some leeway for termination based on disruptive speech if made pursuant to an employee's job duties, we cannot conduct our analysis with [Defendants'] desired version of the facts." *Id.* at 993-94. As explained above, Deltondo's speech was not made pursuant to her job duties, but was speech by a citizen about a matter of public concern. Therefore, the argument for summary judgment on the basis of qualified immunity should be denied.

       **E.  Conclusion**

Therefore, it is respectfully recommended that Defendants' motion for summary judgment be denied.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections within 14 days. Any party opposing the objections shall file a response by 14 days thereafter. Failure to file timely objections will waive the right of appeal.

Dated:  February 13, 2026                    /s/Patricia L. Dodge         
                                                      Patricia L. Dodge
                                                      United States Magistrate Judge